No. 21-2061

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

SPEECH FIRST, INC.,
*Plaintiff-Appellant*,

v.

TIMOTHY SANDS, in his personal capacity and
official capacity as President of Virginia Polytechnic Institute and State University,
*Defendant-Appellee.*

On Appeal from the United States District Court
for the Western District of Virginia, No. 7:21-cv-00203 (Urbanski, J.)

## BRIEF OF APPELLANT SPEECH FIRST, INC.

J. Michael Connolly
Cameron T. Norris
James F. Hasson
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
cam@consovoymccarthy.com
james@consovoymccarthy.com

*Counsel for Appellant Speech First, Inc.*

No. 21-2061, *Speech First, Inc. v. Sands*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Per Rule 26.1 and Circuit Rule 26.1, Appellant certifies that the following have

an interest in the outcome of this appeal:

1. Ashwell, Erin B., *Counsel for Defendant-Appellee*

2. Burchard, Kendall T., *Counsel for Defendant-Appellee*

3. Connolly, J. Michael, *Counsel for Plaintiff-Appellant*

4. Consovoy McCarthy PLLC, *Counsel for Plaintiff-Appellant*

5. Hartman, Kristina J., *Counsel for Defendant-Appellee*

6. Hasson, James F., *Counsel for Plaintiff-Appellant*

7. Hedblom, Jacqueline C., *Counsel for Defendant-Appellee*

8. Herring, Mark R., *Counsel for Defendant-Appellee*

9. Heytens, Toby J., *Counsel for Defendant-Appellee*

10. Kallen, Michelle S., *Counsel for Defendant-Appellee*

11. McClanahan, M. Hudson, *Counsel for Defendant-Appellee*

12. Norris, Cameron T., *Counsel for Plaintiff-Appellant*

13. O'Brien, Blaire, *Counsel for Defendant-Appellee*

14. Samuels, Jessica M., *Counsel for Defendant-Appellee*

15. Sands, Timothy, *Defendant-Appellee*

16. Speech First, Inc., *Plaintiff-Appellant*

17. Towell, Samuel T., *Counsel for Defendant-Appellee*

18.    Urbanski, Michael F., *Trial Judge*

Speech First, Inc. has no parent corporation, and no corporation owns 10% or more of its stock. No publicly traded company or corporation has an interest in the outcome of this case or appeal.

*/s/ J. Michael Connolly*
Counsel for Speech First, Inc.
Dated: January 10, 2022

# TABLE OF CONTENTS

Table of Authorities .................................................................................................. v

Jurisdictional Statement ............................................................................................ 1

Statement of the Issues ............................................................................................. 1

Statement of the Case ................................................................................................ 2

    I.    Virginia Tech's Efforts to Prohibit and Eliminate "Biased" Speech ................ 2

        A.    The Broader Movement to Prohibit and Punish "Biased" Speech on College Campuses ................................................................................ 2

        B.    Virginia Tech's Bias-Incidents Policy and Bias Intervention and Response Team .................................................................................. 5

    II.   Virginia Tech's Prohibition of Student Speech in Public Spaces Without Prior Approval ............................................................................... 9

        A.    The Broader Movement to Restrict Speech on College Campuses ........... 9

        B.    Virginia Tech's Informational-Activities Policy ........................................... 9

    III.  Speech First and Its Members at Virginia Tech ............................................... 10

    IV.  Proceedings Below ........................................................................................... 13

Standard of Review ................................................................................................... 16

Summary of Argument .............................................................................................. 17

Argument ................................................................................................................... 18

    I.    The district court improperly denied a preliminary injunction. ....................... 18

        A.    Speech First likely has standing to challenge the bias-incidents policy ................................................................................................. 18

        B.    The informational-activities policy likely violates the First Amendment. ............................................................................................... 31

            1.    The informational-activities policy is an unconstitutional prior restraint. ......................................................................... 32

            2.    The informational-activities policy is an unconstitutional speaker-based regulation .................................................... 35

II.   If this Court agrees with Speech First on the likely merits, then it should grant a preliminary injunction. ....................................................... 37

Conclusion ............................................................................................. 39

Statement Regarding Oral Argument ................................................... 41

Certificate of Compliance ..................................................................... 41

Certificate of Service ............................................................................. 42

# TABLE OF AUTHORITIES

**CASES**

*281 Care Comm. v. Arneson,*
  638 F.3d 621 (8th Cir. 2011) ................................................................. 24

*Abbott v. Pastides,*
  900 F.3d 160 (4th Cir. 2018) ............................................................ 27, 28

*ACLU of Ill. v. Alvarez,*
  679 F.3d 583 (7th Cir. 2012) ................................................................. 38

*Am. C.L. Union of N. Carolina v. Tennyson,*
  815 F.3d 183 (4th Cir. 2016) ................................................................. 35

*Am. Commc'ns Ass'n v. Douds,*
  339 U.S. 382 (1950) ............................................................................... 20

*Am. Entertainers, L.L.C. v. City of Rocky Mount,*
  888 F.3d 707 (4th Cir. 2018) ................................................................. 32

*Ashcroft v. ACLU,*
  542 U.S. 656 (2004) ............................................................................... 17

*Backpage.com, LLC v. Dart,*
  807 F.3d 229 (7th Cir. 2015) ................................................................. 20

*Bantam Books, Inc. v. Sullivan,*
  372 U.S. 58 (1963) ........................................................... 20, 22, 23, 26

*Benham v. City of Charlotte, N.C.,*
  635 F.3d 129 (4th Cir. 2011) ................................................................. 19

*Bose Corp. v. Consumers Union of U.S., Inc.,*
  466 U.S. 485 (1984) ............................................................................... 16

*Centro Tepeyac v. Montgomery Cnty.,*
  722 F.3d 184 (4th Cir. 2013) ............................................................ 37, 38

*Child Evangelism Fellowship of MD, Inc. v. Montgomery Cnty. Pub. Sch.*,
    457 F.3d 376 (4th Cir. 2006) ................................................. 33

*Citizens United v. Fed. Election Com'n*,
    558 U.S. 310 (2010) ........................................................ 36

*Cooksey v. Futtrell*,
    721 F.3d 226 (4th Cir. 2013) ...................................19, 20, 26

*Edwards v. City of Coeur d'Alene*,
    262 F.3d 856 (9th Cir. 2001) .............................................. 35

*Elrod v. Burns*,
    427 U.S. 347 (1976) ........................................................ 38

*FW/PBS, Inc. v. City of Dallas*,
    493 U.S. 215 (1990) ........................................................ 32

*Giovani Carandola, Ltd. v. Bason*,
    303 F.3d 507 (4th Cir. 2002) .........................................36, 38, 39

*Harrell v. Fla Bar*,
    608 F.3d 1241 (11th Cir. 2010) ........................................... 19

*Healy v. James*,
    408 U.S. 169 (1972) ........................................................ 2

*Horina v. City of Granite City, Ill.*,
    538 F.3d 624 (7th Cir. 2008) .............................................. 35

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977) ........................................................ 18

*Jones v. Jegley*,
    947 F.3d 1100 (8th Cir. 2020) ............................................ 36

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
    385 U.S. 589 (1967) ........................................................ 2

*Levin v. Harleston*,
    966 F.2d 85 (2d Cir. 1992) ............................................passim

*Lopez v. Candaele,*
    630 F.3d 775 (9th Cir. 2010) ............................................................... 19

*Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.,*
    722 F.3d 591 (4th Cir. 2013) ............................................................... 16

*N.Y. Youth Club v. Town of Harrison,*
    150 F. Supp. 3d 264 (S.D.N.Y. 2015) ............................................... 35

*Newsom ex rel. Newsom v. Albemarle Cty. Sch. Bd.,*
    354 F.3d 249 (4th Cir. 2003) ............................................................... 35

*Okwedy v. Molinari,*
    333 F.3d 339 (2d Cir. 2003) ................................................................. 21

*Papish v. Bd. of Curators of Univ. of Mo.,*
    410 U.S. 667 (1973) .................................................................................. 2

*Pashby v. Delia,*
    709 F.3d 307 (4th Cir. 2013) ............................................................... 16

*Promotions, Ltd. v. Conrad,*
    420 U.S. 546 (1975) ................................................................................ 32

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015) ............................................................................... 36

*Roberts v. Haragan,*
    346 F. Supp. 2d 853 (N.D. Tex. 2004) .............................................. 9

*Roe v. Dep't of Def.,*
    947 F.3d 207 (4th Cir. 2020) ............................................................... 16

*Scott v. Roberts,*
    612 F.3d 1279 (11th Cir. 2010) .................................................... 37, 39

*Shuttlesworth v. City of Birmingham,*
    394 U.S. 147 (1969) ............................................................................... 32

*SisterSong Women of Color Reprod. Just. Collective v. Kemp,*
    410 F. Supp. 3d 1327 (N.D. Ga. 2019) ............................................. 29

*Snyder v. Phelps,*
    562 U.S. 443 (2011) ............................................................................2

*Sorrell v. IMS Health Inc.,*
    564 U.S. 552 (2011) .......................................................................... 23

*Speech First, Inc. v. Fenves,*
    979 F.3d 319 (5th Cir. 2020) ....................................................passim

*Speech First, Inc. v. Killeen,*
    968 F.3d 628 (7th Cir. 2020) ....................................................passim

*Speech First, Inc. v. Schlissel,*
    939 F.3d 756 (6th Cir. 2019) ....................................................passim

*Steakhouse, Inc. v. City of Raleigh,*
    166 F.3d 634 (4th Cir. 1999) ......................................................... 37

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) ................................................................... 19, 24

*Sweezy v. N.H. ex rel. Wyman,*
    354 U.S. 234 (1957) ............................................................................2

*Turning Point USA at Ark. State Univ. v. Rhodes,*
    973 F.3d 868 (8th Cir. 2020) ......................................................... 36

*United States v. O'Nan,*
    452 F. App'x 280 (4th Cir. 2011) ................................................. 16

*United States v. Playboy Entm't Grp., Inc.,*
    529 U.S. 803 (2000) ........................................................................ 24

*Univ. of Cincinnati Chapter of Young Americans for Liberty v. Williams,* 2012 WL 2160969
    (S.D. Ohio June 12, 2012) ................................................................9

*Waskul v. Washtenaw Cty. Cmty. Mental Health,*
    900 F.3d 250 (6th Cir. 2018) ......................................................... 16

*Weinberg v. City of Chicago,*
310 F.3d 1029 (7th Cir. 2002) ..............................................................32, 33, 34

*White v. Lee,*
227 F.3d 1214 (9th Cir. 2000) ...................................................................... 20, 24

*Wollschlaeger v. Governor, Fla.,*
848 F.3d 1293 (11th Cir. 2016) ........................................................................ 24

*WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave,*
553 F.3d 292 (4th Cir. 2009) ........................................................................... 38

## STATUTES

28 U.S.C. §1292(a)(1) ..........................................................................................1

28 U.S.C. §1343 ....................................................................................................1

## OTHER AUTHORITIES

Cabranes, *For Freedom of Expression, For Due Process, and For Yale: The Emerging Threat to Academic Freedom at a Great University*, 35 Yale L. & Pol. Rev. 345 (2017).....................4

FIRE, *Free Speech Zones on America's Campuses*, (Sept. 19, 2013) .........................................9

FIRE, *Free Speech Zones*, (May 24, 2019) .............................................................9

FIRE, *Spotlight on Speech Codes 2019*......................................................................9

*If You See Something, Say Something*, DHS .............................................................7

Schneider, *'Bias Teams' Welcome the Class of 1984*, Wall St. J. (Aug. 5, 2019).....................3

Univ. of N. Colo., *President Kay Norton's State of the University Address* (Sept. 7, 2016)......4

# JURISDICTIONAL STATEMENT

The district court had jurisdiction because Speech First alleges that the defendant ("the University") violated the First and Fourteenth Amendments. 28 U.S.C. §1331; §1343. This Court has jurisdiction because Speech First appeals from an order denying injunctive relief. *Id.* §1292(a)(1). The district court entered that order on September 22, 2021, and Speech First appealed on September 24, 2021. JA693.

# STATEMENT OF THE ISSUES

**I.** The University maintains a "bias response team"—a group of authority figures that solicits reports of "bias," tracks them, investigates them, asks to meet with the perpetrators, and threatens to refer students for formal discipline. The Fifth and Sixth Circuits held that virtually identical teams objectively chill students' speech. Was the district court correct that the University's team likely does not chill student speech?

**II.** The University's "informational-activities" policy forbids students from "distributing literature or petitioning for signatures" on campus unless they receive prior approval from the University and are a member of a university-sponsored organization. The policy gives the University total discretion to permit or deny approval for any reason it chooses. Was the district court correct that it could not enjoin the policy because there was no evidence in the record that the policy is "reasonable as a matter of law"?

**III.** Appellate courts can order the entry of a preliminary injunction when a remand would be pointless or harmful. Here, the equitable factors are easy, and the

district court already explained how it would weigh them if Speech First is likely to succeed on the merits. Should this Court enter a preliminary injunction now?

## STATEMENT OF THE CASE

### I.   Virginia Tech's Efforts to Prohibit and Eliminate "Biased" Speech

#### A.   The Broader Movement to Prohibit and Punish "Biased" Speech on College Campuses

The First Amendment reflects "'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Snyder v. Phelps*, 562 U.S. 443, 452 (2011). The "vigilant protection" of constitutional freedoms is "nowhere more vital than in the community of American schools [of higher education]." *Healy v. James*, 408 U.S. 169, 180 (1972). American universities are "peculiarly the marketplace of ideas," training future leaders "through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, rather than through any kind of authoritative selection." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967) (cleaned up). "Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Sweezy v. N.H. ex rel. Wyman*, 354 U.S. 234, 250 (1957). Put simply, "First Amendment protections [do not] apply with less force on college campuses than in the community at large," *Healy*, 408 U.S. at 180, and the "mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency,'" *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 670 (1973).

Yet colleges and universities across the country have resisted this promise to students. Instead of allowing free-ranging debate, many universities are now more interested in protecting students from ideas that make them uncomfortable. Universities do this by adopting policies and procedures that discourage speech by students who reject the prevailing campus orthodoxy.

One recent (and growing) effort to suppress speech is the "bias response team." Living up to their Orwellian name, these teams encourage students to monitor each other's speech and to report incidents of "bias" to the university. "Bias" is defined broadly and covers wide swaths of protected speech; in fact, whether speech is "biased" often turns on the *listener's* subjective reaction to it. *See* JA246, 249-51. Students have been reported to bias-response teams for writing a satirical article about "safe spaces," tweeting "#BlackLivesMatter," chalking "Build the Wall" on a sidewalk, defending Justice Kavanaugh, watching a video of Ben Shapiro, and much more. JA252-55; Schneider, *'Bias Teams' Welcome the Class of 1984*, Wall St. J. (Aug. 5, 2019), on.wsj.com/38JCDob.

After receiving reports of a bias incident, the bias-response team typically logs the incident, investigates it, meets with the relevant parties, attempts to reeducate the "offender," and recommends formal or informal discipline. *E.g.*, *Speech First, Inc. v. Fenves*, 979 F.3d 319, 325-26 (5th Cir. 2020); *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 762-63 (6th Cir. 2019). Bias-response teams are usually staffed by university administrators, disciplinarians, and even police officers—a literal "speech police."

JA245, 256; *see* Cabranes, *For Freedom of Expression, For Due Process, and For Yale: The Emerging Threat to Academic Freedom at a Great University*, 35 Yale L. & Pol. Rev. 345, 360 (2017).

Although universities say that bias-response teams are unthreatening, they know that students do not see it that way. According to a comprehensive study by the Foundation for Individual Rights in Education (FIRE), bias-response teams "effectively establish a surveillance state on campus where students . . . must guard their every utterance for fear of being reported to and investigated by the administration." JA265. Professors, too, have recognized that these teams "result in a troubling silence": they leave students "afraid to speak their minds," and empower virtually anyone to "leverage bias reporting policies to shut down unpopular or minority viewpoints." *Id.* at 264. For example, the University of Northern Colorado shuttered its bias-response team because it had come "at the expense of free speech and academic freedom"; its supposedly "voluntary" processes "made people feel that we were telling them what they should and shouldn't say." A. Steinbaugh, *University of Northern Colorado to End 'Bias Response Team,' But What Next?*, TheFIRE, Sept. 9, 2016, https://bit.ly/3JQjbHw (quoting *President Kay Norton's State of the University Address* (Sept. 7, 2016), bit.ly/3zUF57l). The University of Iowa likewise scrapped its plans to create a bias-response team, citing their "high failure rate" and their tendency to "become almost punitive." JA264.

Yet bias-response teams continue to proliferate. FIRE estimates that more than 200 universities have bias-response teams, and the number is "growing rapidly." JA241.

The number of these teams will continue to grow if courts allow them to chill indirectly what universities cannot prohibit directly.

**B.  Virginia Tech's Bias-Incidents Policy and Bias Intervention and Response Team**

Virginia Tech has joined this unfortunate trend and, in fact, has one of the worst bias-response teams in the country. The University monitors, logs, and responds to student speech through its "bias-incidents" policy, which it enforces through its Bias Intervention and Response Team ("BIRT"). JA368. The BIRT is staffed by senior University officials, including those with disciplinary power. JA370. On the BIRT are members of the Dean of Students Office, the Office of Student Conduct, the Virginia Tech Police Department, and other university officials. JA370. BIRT's purpose, as reflected by its name, is straightforward: to "eliminate" biased speech through "immediate direct or indirect responses to bias-related incidents." JA369.

The University has adopted a formal definition of a "bias incident." JA333. A "bias incident" is defined as "*expressions* against a person or group because of the person's or group's age, color, disability, gender (including pregnancy), gender identity, gender expression, genetic information, national origin, political affiliation, race, religion, sexual orientation, veteran status, or any other basis protected by law." JA333 (emphasis added); *see* JA204. A bias incident can occur on or off campus, including on social media. JA149. Examples of bias incidents include "words or actions that contradict the spirit of the Principles of Community," "jokes that are demeaning to a

particular group of people," "assuming characteristics of a minority group for advertising," and "posting flyers that contain demeaning language or images." JA333. To avoid a bias incident, the University warns students to "[b]e aware of words, images, and situations that suggest all or most of a group are the same"; "[a]void qualifiers that reinforce stereotypes"; "[b]e aware of language that has questionable racial, ethnic, class, or sexual orientation connotations"; "[a]void patronizing language and tokenism toward any group"; and "[r]eview language, images, and other forms of communication to make sure all groups are fairly represented." JA144.

Reporting expressions of "bias" is easy. Students and third parties can submit complaints about bias incidents on the University's website through an online reporting tool (the "Bias Incident Reporting Form"), email, or Twitter. JA355-56, ¶8; JA146-47. Like a crime-reporting hotline, complaints about biased speech can be made anonymously. JA147. The intake form asks students to specify the date and location of the alleged incident and to "list all involved parties." JA147-48. It contains entries for the perpetrator's name, role in a student organization (if any), email address, and Virginia Tech student ID number. JA147-48. Complainants can choose from a list of twelve personal characteristics (*e.g.*, race, gender identity, political affiliation) as the alleged basis for the bias-related incident. JA148-49. Complainants then identify where the speech was made, such as "Comment in Class or Assignment," "Comment in Person," "Comment in Writing or on Internet," "Comment via Email/Text," or

"Comment via Phone/Voicemail." JA149. Students "can be referred for bias-based behavior" at all times—"[f]rom admission to commencement." JA372.

The University actively promotes BIRT and its bias-incidents policy to encourage students to report bias incidents and to ensure that its system is "publicized and known to all community members." JA372. In particular, the University encourages students to report one another through its "See Something? Say Something!" campaign— borrowing the Department of Homeland Security's famous program regarding terrorism. JA204; *see generally If You See Something, Say Something*, DHS, dhs.gov/see- something-say-something. Similarly, the Dean of Students "encourage[s]" students "to make a report" if they "hear or see something that *feels* like a bias incident statement or expression," even if they are "unsure." JA200 (emphasis added). "In short, if you see something, say something!" JA200; *see also* JA202, 209, 213. Like law enforcement, BIRT uses terminology suggesting that a crime has occurred, including "victim," "bystander," "perpetrator," "targeted," "incident," and "accused." JA369-70.

University records reveal that the vast majority of bias-incident reports involve protected speech. "Bias-related incidents" reported to the University during the Fall 2018 semester included:

- A report that the words "Saudi Arabia" were written on a whiteboard outside of a student's dorm room. According to the report, the rest of the words on the whiteboard had either been erased or were illegible. Nevertheless, the complainant alleged bias based on "national or ethnic origin." JA173.

- A report that a student in a University residence hall overheard several male students privately "talking crap about the women who were 'playing' in [a] snowball fight." The witness "could not remember exact quotations," but stated that "the young men said that the young ladies in the snowball fight were not athletic." The complaint alleged "discrimination" and "harassment" based on "gender." JA177.

- A report that a student told a joke that included "Caitlyn Jenner's deadname" during a classroom "lecture about … corn." The complaint alleged "discrimination" on the basis of "gender identity." JA180.

The University attempts to "be both proactive and responsive" to allegations of bias incidents. JA368, 372. The BIRT usually responds to complaints "within 24 hours." JA278. Complaints about bias incidents are directed to the Office of the Dean of Students. JA372. The Dean's Office will "record exactly what was said" and will "log details of the incident" in the Dean's case management system. JA368-69; JA372; JA361, ¶17. In determining whether "bias" occurred, the Dean's Office will ask, among other things, whether the expression was "bias-motivated" or "violate[s] the shared values and expectations of university community members." JA333. If BIRT "determine[s] [that] bias exists," it will engage in an "intervention" with the student that will be "educational or restorative." JA372; *see* JA143. If "appropriate," the incident will be referred to the "Virginia Tech or Blacksburg Police Department, [the] Threat Assessment Team, [the] Student Conduct Office, [or the] Title IX Office." JA368; JA355-56, ¶8; JA359-60, ¶15.

## II. Virginia Tech's Prohibition of Student Speech in Public Spaces Without Prior Approval

### A. The Broader Movement to Restrict Speech on College Campuses

The Supreme Court held five decades ago that "a heavy burden rests on [a] college" seeking to "demonstrate the appropriateness of" a prior restraint on speech, *Healy*, 408 U.S. at 184, but that hasn't stopped many universities from trying. Universities have adopted numerous measures to limit and control speech on their campuses, including "free speech zones" that restrict student expression to isolated parts of campus, regulations requiring students to request permission before engaging in speech, and discretionary "permitting" schemes for leafleting. *See, e.g.*, FIRE, *Free Speech Zones*, (May 24, 2019), https://bit.ly/3yP6jwg; *Univ. of Cincinnati Chapter of Young Americans for Liberty v. Williams*, 2012 WL 2160969, at *7 (S.D. Ohio June 12, 2012); *Roberts v. Haragan*, 346 F. Supp. 2d 853 (N.D. Tex. 2004). As of 2013, at least one in six colleges and universities had policies that imposed prior restraints on student speech. FIRE, *Free Speech Zones on America's Campuses*, (Sept. 19, 2013), https://bit.ly/3FnrzMg.

### B. Virginia Tech's Informational-Activities Policy

Although many public universities have since abandoned such policies, *see* FIRE, *Spotlight on Speech Codes 2019*, https://bit.ly/3qjeMnF, Virginia Tech is holding on. In Policy 5215, the University restricts any "informational activities" on its campus unless the student receives "prior approval" from the University and the student is "sponsored by a university-affiliated organization." JA225. The policy defines "informational activity" as "the distribution of literature and/or petitioning for signatures where no fee

is involved nor donations or contributions sought." JA225. Thus, for example, students cannot pass out pamphlets supporting a presidential candidate or gather signatures to support a ballot initiative unless they receive approval from the University and are sponsored by a student organization.

The informational-activities policy contains no objective criteria detailing when the University will grant or deny students' requests for "prior approval" to speak on campus. JA225. The policy states only that the request will be "subject to university policies and the reasonable guidelines of the authorizing official." JA225. The policy also contains no time period by which the official must act after receiving the request. JA225. In short, the policy gives University officials unbridled discretion to grant, deny, or ignore each request they receive.

## III. Speech First and Its Members at Virginia Tech

Plaintiff, Speech First, is a nationwide membership organization dedicated to preserving human and civil rights secured by law, including the freedom of speech. JA335, ¶2. Speech First protects the rights of students at colleges and universities through litigation and other lawful means. JA335, ¶2. Speech First has successfully vindicated students' rights at the University of Michigan, the University of Texas, the University of Illinois, Iowa State University, and the University of Central Florida. *See* Court Battles, Speech First, bit.ly/3usoh4s.

Speech First has several members who currently attend the University, including Students A and C. JA335, ¶¶3-4.[1] These students' views are "unpopular, controversial, and in the minority on campus." JA337, ¶4; JA347, ¶4. For example, Student A believes that "Black Lives Matter has had a terrible impact on society" and that gay marriage is a "slippery slope" that could "lead to society being forced to accept marriages among multiple people or something even worse." JA337-38, ¶¶6, 9. Student A also believes that "human beings are created either male or female" and doesn't want "to be forced to use someone's 'preferred pronouns' simply because that person believes that his or her 'truth' involves being 'non-binary.'" JA338, ¶8. Student C believes "we need a border wall and border security," that "[w]e can't have a country without borders," and that "illegal immigrants" must be stopped from "crossing the border daily and . . . getting welfare without paying taxes." JA348, ¶9.

Students A and C censor their speech because of the University's bias-incidents policy and its enforcement through BIRT. JA338-40, ¶¶13-15, 19; JA348-50, ¶¶12-14, 18. Students A and C want to "engage in open and robust intellectual debate" with their fellow students and "speak passionately and repeatedly" about their views in class, online, and in the broader community. JA339, ¶13; JA348, ¶12. But Students A and C fear that students, faculty members, or others will report them to University officials for committing a bias incident. JA340, ¶19; JA350, ¶18. Because the definition of "bias"

---

[1] One of Speech First's members, Student B, graduated in May 2021. JA640.

is so broad and vague, Students A and C know that someone will find their speech to be biased and report them. JA340, ¶19; JA350, ¶18. Students A and C fear that the University will take action against them because of their "biased" speech. JA340, ¶19; JA350, ¶18. For example, they fear that the Dean of Students will keep a record on them, share the allegations with others at the university, call them in for meetings or "interventions," or refer the allegations to disciplinary authorities, including the Office of Student Conduct. JA340, ¶19; JA350, ¶18. As a consequence, Students A and C do not fully express their beliefs, discuss certain topics, or otherwise engage in protected speech. JA340, ¶19; JA350, ¶18.

These fears are objectively reasonable. Confirming their fears, as soon as Speech First filed this lawsuit, Professor Matthew Gabriele, a Virginia Tech tenured professor and department chair, publicly called Students A and C "conservative shitbags" who were "suing the school because they're bigots." JA274. Nor are Students A and C alone. Tellingly, only twenty percent of Virginia Tech students who responded to a recent Gallup survey said they felt comfortable expressing ideas in class that "are probably only held by a minority of people." JA319.

Students A and C also refrain from speaking on campus because of the University's informational-activities policy. JA338-40, ¶¶13-15, 20; JA348-50, ¶¶12-14, 19. Students A and C want to share their beliefs with other members of the University by independently distributing literature about conservative ideas and collecting signatures for petitions that support conservative causes, especially in high-traffic areas

that are open to the public. JA340-41, ¶20; JA350, ¶19. But they refrain from doing either expressive activity because they fear that they will be punished for engaging in "informational activities" without prior approval and without the sponsorship of a "university-affiliated organization." JA340-41, ¶20; JA350, ¶19.

## IV. Proceedings Below

In April 2021, Speech First filed this suit and moved for a preliminary injunction. Speech First asked the district court to enjoin Virginia Tech from enforcing five policies: (1) its bias-incidents policy; (2) its informational-activities policy; (3) its policy prohibiting "discriminatory harassment"; (4) a computer policy (Policy 7000) prohibiting students from sending messages that violate "the rights of others to be free of intimidation, harassment, and unwarranted annoyance"; and (5) another computer policy (the Acceptable Use Standard) prohibiting students from sending emails for "partisan political purposes," including "advertising . . . for political candidates." Doc. 4-1. Speech First supported its motion with a verified complaint, JA9-58; more than two dozen exhibits, JA59-332; a declaration from its president, JA335-36; and Doe declarations from three of its members (Students A, B, and C), JA337-41; JA342-46; JA347-51.

In response to Speech First's complaint, Virginia Tech amended its Acceptable Use Standard so that the policy applies only to university employees, not students. JA674. Virginia Tech then opposed Speech First's preliminary-injunction motion, arguing that Speech First lacked standing, that the claim against the Acceptable Use

Standard was moot, that the University's policies didn't violate the First Amendment, and that the remaining preliminary-injunction factors weighed in Virginia Tech's favor.

The district court granted Speech First's motion in part and denied it in part. The district court enjoined the University from enforcing the computer policy, Policy 7000. Speech First had standing to challenge this computer policy because its members want to send emails supporting conservative initiatives and political candidates and the policy arguably proscribes this conduct. JA678-81. Speech First also was likely to succeed on the merits because the policy's prohibition on "intimidation, harassment, and unwarranted annoyance" was "clearly vague and overbroad." JA683. And Speech First satisfied the other elements of the preliminary-injunction standard because the loss of First Amendment freedoms "'unquestionably constitutes irreparable injury'" and causes the balance of equities and public interest to weigh in Speech First's favor. JA684.

The district court, however, denied Speech First's motion as to the remaining policies. The court found that Speech First lacked standing to challenge Virginia Tech's bias-incidents policy because the policy "do[es] not proscribe anything" and the BIRT "lacks any authority to discipline or otherwise punish students." JA659. In so holding, the court "recognize[d] its departure from the Sixth Circuit's decision in [*Speech First v. Schlissel*] and the Fifth Circuit's decision in [*Speech First v. Fenves*]," JA662, which both found that Speech First had standing to challenge similar bias-response teams.

The district court also declined to enjoin the informational-activities policy. JA687-90. The court agreed that Speech First had standing to challenge the policy

because the Students "have alleged an intent to engage in protected speech" and their conduct "is clearly proscribed by the informational-activities policy." JA687. Yet the court declined to enjoin the policy because it wanted a "more developed record" into whether the policy's restrictions were "reasonable as a matter of law." JA689-90. Implicit in that conclusion was the assumption that Speech First bore the burden on this question. Because there was insufficient evidence in the record that the university's restrictions were reasonable, the court held that Speech First had not shown that it was likely to succeed on this claim. JA689-90.

Finally, the district court declined to enjoin the other two policies, neither of which is at issue in this appeal. The district court held that Speech First's challenge to the computer policy's Acceptable Use Standard was moot because Virginia Tech amended the policy to "make clear that the prohibition on using the university's network for partisan political purposes only applies to university employees." JA675-78. The district court also declined, based "[o]n this record," to enjoin the discriminatory-harassment policy. JA666-72. Speech First continues to challenge these policies in the underlying litigation, but it does not challenge the district court's refusal to preliminarily enjoin these policies in this appeal.

Speech First timely appealed the partial denial of its motion. *See* JA693-94. The University did not cross-appeal the partial grant of Speech First's motion (and the time to do so has expired).

## STANDARD OF REVIEW

This Court reviews denials of preliminary injunctions for an abuse of discretion. *Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, 722 F.3d 591, 595 (4th Cir. 2013). But because legal errors are abuses of discretion, this Court reviews the district court's legal conclusions de novo. *Id.* And while appellate courts ordinarily review factual findings for clear error, "an appellate court has the obligation to 'make an independent examination of the whole record'" in "cases raising First Amendment issues." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499 (1984); *see also United States v. O'Nan*, 452 F. App'x 280, 282 (4th Cir. 2011) (citing *Bose Corp*, 466 U.S. at 485).

A plaintiff is entitled to a preliminary injunction if four things are true: (1) the plaintiff is "likely to succeed on the merits"; (2) it will suffer "irreparable harm in the absence of preliminary relief"; (3) the "balance of equities tips in [its] favor"; and (4) the injunction "is in the public interest." *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020). For the first factor, the plaintiff's likelihood of success on the merits includes "'not only substantive theories but also … standing.'" *Waskul v. Washtenaw Cty. Cmty. Mental Health*, 900 F.3d 250, 256 n.4 (6th Cir. 2018). Because standing "'must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation,'" a plaintiff must show "[a]t the preliminary injunction stage . . . only that each element of standing is likely." *Fenves*, 979 F.3d at 329-30. Likely does not mean guaranteed. *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013). As to the merits, the

University has the burden (even at the preliminary-injunction stage) of proving the constitutionality of its speech restrictions. *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004).

## SUMMARY OF ARGUMENT

The district court should have preliminarily enjoined the University's bias-incidents policy and informational-activities policy. First, Speech First has standing to challenge the University's bias-incidents policy because the existence of the policy and its enforcement through BIRT chills Speech First's members' speech. Speech First's members want to share their unpopular views but they self-censor because they know their "biased" speech will be reported to BIRT and the University will take action against them. The University will log the allegation in its records, will share the "biased" speech with others, will call the students in for educational and restorative "interventions," and may refer their case to disciplinary authorities. As both the Fifth Circuit and Sixth Circuit have held, these types of bias-response teams objectively chill student expression, regardless of whether the Student Code explicitly prohibits "biased" speech.

Second, the informational-activities policy is likely unconstitutional. The policy is a classic prior restraint. It prohibits any student from engaging in "informational activities"—*i.e.*, distributing literature or petitioning for signatures on campus—without prior written approval from administrators. Because the policy itself provides no narrow, objective guidelines for when officials must grant or deny a request to speak, the policy is facially unconstitutional—regardless of whether the University's goals are

"reasonable." Yet even if these surrounding facts mattered, it was the *University's* burden—not Speech First's—to prove the need for its speech restrictions. Speech First proved that its members were forbidden from speaking without prior approval and without being affiliated with a student organization. That the University failed to prove that these restrictions were reasonable should have weighed in Speech First's favor, not the University's.

Although this Court could simply correct these errors and remand, it should go further and issue a preliminary injunction enjoining the two policies. First Amendment violations cause per se irreparable injury, and neither the University nor the public has any interest in allowing unconstitutional regulations to remain in force. Furthermore, the district court already indicated how it would weigh the remaining preliminary-injunction factors if Speech First is likely to succeed on the merits, and there is no reason to require it to reiterate that analysis a second time. In short, both the law and the principle of judicial economy warrant this Court directing the district court to issue a preliminary injunction.

## ARGUMENT

### I. The district court improperly denied a preliminary injunction.

#### A. Speech First likely has standing to challenge the bias-incidents policy.

As a membership association, Speech First has standing if one of its members has standing. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Speech First's members have standing if they can prove injury, causation, and redressability.

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). When a challenged policy "risks chilling the exercise of First Amendment rights," courts "dispense[] with rigid standing requirements." *Cooksey v. Futtrell*, 721 F.3d 226, 235 (4th Cir. 2013) (cleaned up); *see also Lopez v. Candaele*, 630 F.3d 775, 781 (9th Cir. 2010) ("First Amendment cases raise unique standing considerations that tilt dramatically toward a finding of standing."). "The leniency of First Amendment standing manifests itself most commonly in the doctrine's first element: injury-in-fact." *Cooksey*, 721 F.3d at 235. An individual suffers an injury of "self-censorship," *Benham v. City of Charlotte, N.C.*, 635 F.3d 129, 135 (4th Cir. 2011), if the existence of a policy "risks chilling the exercise of First Amendment rights," *Cooksey*, 721 F.3d at 235 (4th Cir. 2013) (cleaned up), and the chilling effect is "'objectively reasonable,'" *id.* at 236. Enjoining a policy that causes self-censorship obviously redresses that injury. *Id.* at 238; *Harrell v. Fla Bar*, 608 F.3d 1241, 1257 (11th Cir. 2010).

Speech First has standing to challenge the University's bias-incidents policy. Speech First's members want to share their unpopular views on, for example, transgender issues, Black Lives Matter, and illegal immigration. *See* JA337-39 ¶¶5-14; JA347-48, ¶¶5-13. But they do not fully express themselves or talk about certain issues because they know that their speech will be considered "biased," they will be reported to BIRT, and the University will take action against them, including by recording and logging their speech, sharing their "biased" speech with others at the university, calling them in for educational and restorative "interventions," or referring their case to

disciplinary authorities. JA340, ¶19; JA350, ¶18; *supra* at 5-8, 11-12. These fears are "objectively reasonable" and would cause a student of "ordinary firmness" to self-censor. *Cooksey*, 721 F.3d at 236. That is why the Fifth and Sixth Circuits both held that nearly identical bias-incident policies "objectively chill speech." *Schlissel*, 939 F.3d at 765; *Fenves*, 979 F.3d at 333.

The district court found no injury in fact because the bias-incidents policy does not "proscribe anything" and the BIRT "lacks any authority to discipline or otherwise punish students for anything." JA659. But "[i]t is settled" that a policy can objectively chill speech, and thus violate the First Amendment, without punishing anyone or directly prohibiting anything. *Levin v. Harleston*, 966 F.2d 85, 89 (2d Cir. 1992); *Am. Commc'ns Ass'n v. Douds*, 339 U.S. 382, 402 (1950); *Cooksey*, 721 F.3d at 236-37 (explaining that "chilling" is a discrete harm independent of enforcement). For one thing, the government can violate the First Amendment through "'threat[s]'" and "'other means of coercion, persuasion, and intimidation." *White v. Lee*, 227 F.3d 1214, 1228 (9th Cir. 2000) (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)). While government officials are free to engage in speech of their own, there is a "difference between government expression and intimidation—the first permitted by the First Amendment, the latter forbidden by it." *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230 (7th Cir. 2015). A threat can violate the First Amendment "even if it turns out to be empty" and even if the relevant actor "'lacks direct regulatory or decisionmaking authority over [the] plaintiff.'" *Id.* at 230-31 (quoting *Okwedy v. Molinari*, 333 F.3d 339,

344 (2d Cir. 2003)); *see Schlissel*, 939 F.3d at 764 ("Even if an official lacks actual power to punish, the threat of punishment from a public official who appears to have punitive authority can be enough to produce an objective chill.").

For example, in *Okwedy*, the plaintiff rented billboards in Staten Island to denounce homosexuality. 333 F.3d at 341. A town official wrote a letter to the billboard company, on official letterhead, stating that the billboards were "unnecessarily confrontational and offensive" and "convey[ed] an atmosphere of intolerance." *Id.* at 341-42. The official asked the company to "contact" the "Chair of [the] Anti-Bias Task Force" to "establish a dialogue" and "discuss" these issues. *Id.* He appealed to the company "as a responsible member of the business community," reminding it that it "owns a number of billboards on Staten Island." *Id.* at 342. But the official had no authority over billboards. *Id.* at 343. The Second Circuit, in an opinion joined by then-Judge Sotomayor, held that the official's letter plausibly crossed the line "between attempts to convince and attempts to coerce." *Id.* at 344. The letter harkened to the person's "official authority" and "call[ed] on" the company to contact the anti-bias task force. *Id.* "Even though [the official] lacked direct regulatory control over billboards," the company "could reasonably have feared that [he] would use whatever authority he does have" against it. *Id.* And the fact that the letter called for "dialogue" did not dissipate this "implicit threat." *Id.*

These principles also apply in the university setting. In *Levin*, the plaintiff was a college professor who had written inflammatory articles about race. 966 F.2d at 87. In

response, the university created a Committee on Academic Rights and Responsibilities to study "when speech . . . may go beyond the protection of academic freedom or become conduct unbecoming a member of the faculty." *Id.* at 89. (The words "conduct unbecoming" ominously mirrored the language used in the university's disciplinary code for professors. *Id.*) The Second Circuit held that the creation of this committee independently violated the professor's First Amendment rights. *Id.* at 89-90. Even though the committee was "purely advisory, utterly lacking any power to take action," and even though the university never "explicitly" threatened disciplinary charges, the committee's existence was an "implicit threat" that chilled the professor's speech. *Id.* "It is the chilling effect on free speech that violates the First Amendment, and it is plain that an implicit threat can chill as forcibly as an explicit threat." *Id.*

The Supreme Court confronted another scheme to chill speech in *Bantam Books.* Because the First Amendment strictly circumscribes States' power to regulate obscenity, Rhode Island tried to circumvent that limitation by creating a Commission to Encourage Morality in Youth. 372 U.S. at 59. The Commission's mission was to "educate the public" about printed materials that contain "obscene, indecent or impure language, or manifestly tend[] to the corruption of the youth." *Id* The Commission would circulate "lists of objectionable publications," receive "complaints from outraged parents," "investigate" incidents, and "recommend legislation, prosecution and/or treatment" to address these incidents. *Id.* at 60 n.1. If the Commission concluded that a book was "objectionable," it would send a notice to the publisher stating its

conclusion and thanking the publisher for its "cooperation" in preventing its spread. *Id.* at 62-63. A "local police officer" would follow up with the publisher shortly thereafter. *Id.* at 63. Yet the Commission had no power to force publishers to withdraw the materials or punish them if they refused. *Id.* at 66.

The Supreme Court concluded that this regime violated the First Amendment. The Commission's definition of "objectionable" was unconstitutionally vague and overbroad. *Id.* at 65-66, 71. True, the Commission had no "power to apply formal legal sanctions," *id.* at 66, and the publishers were "'free' to ignore the Commission's notices, in the sense that [their] refusal to cooperate would have violated no law," *id.* at 68. But the Supreme Court "look[ed] through forms to the substance" and emphasized that "[p]eople do not lightly disregard public officers' thinly veiled threats." *Id.* at 67-68. "[T]he Commission deliberately set out to achieve the suppression of publications deemed 'objectionable' and succeeded in its aim." *Id.* at 67. Because it "acted as an agency not to advise but to suppress," the Commission violated the First Amendment. *Id.* at 72.

In addition to threats, the government can objectively chill speech by unnecessarily burdening it. "Lawmakers may no more silence unwanted speech by burdening its utterance than by censoring its content." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011). In other words, "[t]he distinction between laws burdening and laws banning speech is but a matter of degree. The Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans." *United States v. Playboy*

*Entm't Grp., Inc.*, 529 U.S. 803, 812 (2000). Burdens that can objectively chill speech include "reputational harm," career harms from "[e]ven the mere filing of a complaint," drains on "time and resources," "administrative action," investigations, and more. *Schlissel*, 939 F.3d at 765; *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1322 (11th Cir. 2017); *SBA List*, 573 U.S. at 165; *White*, 227 F.3d at 1228. For example, in *Levin*, the university responded to the professor's speech not only by creating a committee, but also by allowing students assigned to his class to transfer to an "alternative" section. 966 F.2d at 87-88. Even though the professor was still allowed to teach, the Second Circuit held that the University independently violated his First Amendment rights by "'stigmatizing'" him with the creation of these "shadow classes." *Id.* at 88.

Bias-response teams use both of these methods—implicit threats and unnecessary burdens—to objectively chill speech. Here, the entire point of the BIRT is to implicitly threaten students with discipline if they say something "biased." And this bureaucratic apparatus gives students "grounds to reasonably fear that, unless they modify their speech, they will be subject to … hassle and expense." *281 Care Comm. v. Arneson*, 638 F.3d 621, 631 (8th Cir. 2011). Like other bias-response teams, the BIRT represents "the clenched fist in the velvet glove of student speech regulation." *Fenves*, 979 F.3d at 338.

The BIRT "acts by way of implicit threat of punishment and intimidation to quell speech." *Schlissel*, 939 F.3d at 765. From beginning to end, the BIRT is designed to send a clear message to students: If you engage in a "bias incident," you are in trouble. Unlike

an ordinary division of the University, the very name Bias Intervention and Response Team "suggests that the accused student's actions have been prejudged to be biased" and "could result in far-reaching consequences" from professors or the university. *Schlissel*, 939 F.3d at 765. It is not the "Bias Incident *Support* Team," after all. The BIRT's terminology—"bias," "incident," "victim," "bystander," "perpetrator," "targeted," and "accused"—also suggests serious misconduct. JA369-70; *Schlissel*, 939 F.3d at 765 ("Nobody would choose to be considered biased"); *Fenves*, 979 F.3d at 338 ("The CCRT describes its work, judgmentally, in terms of 'targets' and 'initiators' of incidents."); *Speech First, Inc. v. Killeen*, 968 F.3d 628, 652 (7th Cir. 2020) (Brennan, J., concurring in part and dissenting in part) (similar). The University also equates bias incidents to punishable offenses like "crime[s]" and "harassment." JA368, 372; *see Fenves*, 979 F.3d at 335 (explaining that similar cross-references bolstered Speech First's standing by suggesting that the policies were "intertwined" and "overlapping").

That the University "invites anonymous reports" to the BIRT likewise "carries particular overtones of intimidation to students whose views are 'outside the mainstream.'" *Fenves*, 979 F.3d at 338. It also carries "reputational damage" that can "impair a student's prospects for academic and professional success." *Killeen*, 968 F.3d at 652 (Brennan, J., concurring/dissenting); *Schlissel*, 939 F.3d at 765 (same). Because the BIRT is comprised of high-level university administrators, a student "could be forgiven for thinking that inquiries from and dealings with the [BIRT] could have dramatic effects such as currying disfavor with a professor, or impacting future job

prospects." *Schlissel*, 939 F.3d at 765. Experts thus agree that these teams "create . . . a chilling effect on campus expression." JA242; *see* JA281-90; *Fenves*, 979 F.3d at 338.

The BIRT's "ability to make referrals" is one particular way that the team "objectively chills speech." *Schlissel*, 939 F.3d at 765; *accord Fenves*, 979 F.3d at 333. Referrals can "lead to" formal discipline and, at a minimum, "initiate[] the formal investigative process, which itself is chilling." *Schlissel*, 939 F.3d at 765. As the district court noted, "BIRT has referred protected speech" to Student Conduct in recent years, "including an Instagram post expressing 'unpopular opinions about illegal immigration,'" one of the *exact* topic Speech First's members want to discuss. JA658 (citing JA385-86, ¶13); *see* JA338, ¶10; JA348, ¶9. The district court focused too heavily on the frequency of these referrals. JA662. Students know that the BIRT refers bias incidents to the authorities—which, for some of the BIRT's members, means referring the matter to themselves. That alone is enough to chill student speech. *See Bantam Books*, 372 U.S. at 67-68; *Levin*, 966 F.2d at 89.

The BIRT also chills speech with its "review process," JA372—a kind of "'process-is-punishment' mechanism that deters people from speaking out," JA265. Committing a "bias incident" can get a student reported, his speech documented and investigated, and his case referred for "educational and restorative" intervention. JA372; *see* JA143. Many students will "not speak at all if they fear that University officials are monitoring them for biased speech." *Killeen*, 968 F.3d at 652 (Brennan, J., concurring/dissenting); *Cooksey*, 721 F.3d at 236-37 (speech is chilled when the

government "reserves the right to continue to monitor" an individual's speech). And "[r]easonably risk-averse students generally avoid a burdensome investigative process." *Killeen*, 968 F.3d at 652 (Brennan, J., concurring/dissenting).

Though "educational" and "restorative" interventions are ostensibly "voluntary," a reasonable college student would not see them that way. *See Schlissel*, 939 F.3d at 765. These impressionable 18- to 22-year-olds, many living away from their parents for the first time with tens of thousands of dollars in student loans, are unlikely to treat a request from a university authority figure to have an intervention over accusations of "bias" as voluntary. *See id.* (an invitation from a bias-response team carries "an implicit threat of consequence should a student decline the invitation"— "meet, or we will refer your case"). Especially not at Virginia Tech, which prohibits any "[f]ailure to comply with a request and directives of university officials acting in the scope of their authority." JA107-08. More likely, "objectively reasonable students" will "mitigate their exposure to any allegation that might trigger a bias investigation" by simply staying quiet. *Killeen*, 968 F.3d at 652 (Brennan, J., concurring/dissenting). As Judge Brennan recently put it, "'[p]rocess is punishment' is not a platitude; a University-controlled clearinghouse for speech can deter students from speaking out." *Id.*

Contra the district court, *Abbott v. Pastides* is not controlling. 900 F.3d 160 (4th Cir. 2018). *Abbott* considered student meetings that were part of the University of South Carolina's ordinary (and unchallenged) student-conduct process, not an elaborate bureaucratic regime that is designed to deter "biased" speech. This Court also stressed

that the university had met with the student about the same speech, "approved and encouraged" that speech, gave him "written notice that neither investigation nor sanction was forthcoming," "dismissed student complaints" about that speech, and "made no effort to sanction that speech after the fact." 900 F.3d at 180, 177. The University points to nothing like that here. *Abbott*'s highly unusual facts explain why this Court stressed that its decision was "limited to the facts before [it]" and why it denied that its decision should be read to "make it impossible for any student to mount a successful challenge." *Id.* at 180. *Abbott* was also decided on summary judgment, after the plaintiff would have received discovery. And Speech First has submitted evidence of chill here that was not present in *Abbott*—such as Virginia Tech's own surveys, its policy on condoning or supporting violations, and its elaborate "bias" apparatus. *Supra* at 5-8, 11-12.

The district court should not have followed the Seventh Circuit's contrary decision in *Killeen*. JA660. The Seventh Circuit mainly faulted Speech First for the state of the record. The Seventh Circuit was mistaken: The Fifth and Sixth Circuits ruled for Speech First on virtually identical records. But regardless, this Court has in the record what the Seventh Circuit thought was missing. The Seventh Circuit faulted Speech First for not "identify[ing] in the record specific statements any students wish to make," "through Doe affidavits or otherwise." *Killeen*, 968 F.3d at 640, 643. Here, Speech First's members submitted detailed Doe declarations describing the views they wish to express and the chilling effects of Virginia Tech's policies. *See* JA337-41; JA347-51. Speech First

also submitted a verified complaint, *see* JA9-58, which counts as evidence at this stage. *See SisterSong Women of Color Reprod. Just. Collective v. Kemp*, 410 F. Supp. 3d 1327, 1343 n.10 (N.D. Ga. 2019); *Killeen*, 968 F.3d at 653 n.5 (Brennan, J., concurring/dissenting) (noting that the complaint's allegations would have been evidence had Speech First's complaint been "verified"). And Speech First presented unrebutted studies and surveys about how students view these kinds of policies. *See* JA242; JA319.

The district court discounted *Schlissel*, *Fenves*, and the FIRE reports because those authorities didn't "assert[] that all bias response teams are *per se* unconstitutional." JA661. But there is no meaningful difference between the BIRT here and the unconstitutional bias-response teams in *Schlissel*, *Fenves*, and the FIRE reports. Like Virginia Tech, Texas denied that its team ever "'investigated or punished'" anyone "'for engaging in speech or expression protected by the First Amendment.'" Appellee's Br. 16-17, 2019 WL 5296547. And Texas said it didn't meet with students *at all*. *Id.* at 38. Like Virginia Tech, Michigan insisted its meetings were entirely "voluntary." 333 F. Supp. 3d 700, 710-11 (E.D. Mich. 2018). "[T]he meeting *is* voluntary," the Sixth Circuit held, but that fact doesn't eliminate the overall chilling effect. 939 F.3d at 765. If Speech First had standing in those cases, it has standing here. Indeed, that is why the district court ultimately recognized that its opinion directly conflicted with the Fifth and Sixth Circuits. JA662.

The district court downplayed the chilling effects of BIRT's referral power because "any . . . member of the Virginia Tech community" may report a student code

violation. JA662. But this observation only proves the point. If Virginia Tech could collect reports anyway, why create a separate response team, staff it with authority figures, formally define "bias incident," use disciplinary lingo, solicit anonymous complaints, threaten referrals, and seek to have an "intervention"? It's because this elaborate regime is designed to eliminate "biased" speech by implicitly threatening students with consequences "that they otherwise would not face." *Schlissel*, 939 F.3d at 765. Speech First's unrebutted evidence proves that students receive precisely that message. JA340, ¶19; JA350, ¶18; JA237-272; JA280-91; *see also* JA18-19, ¶34; *Fenves*, 979 F.3d at 338.

*   *   *

For all these reasons, Speech First has shown that the BIRT "is sufficiently proscriptive to objectively chill student speech." *Fenves*, 979 F.3d at 333. Again, the question at this stage of the litigation is what is *likely*. *Supra* at 16. Speech First does not need to definitively prove the true nature of the BIRT, and this Court is not being asked to render a final judgment on that question. But by looking at the team's design, its purpose, its operation, the experiences of Speech First's members and of other universities, and making common-sense observations about the dynamics between college students and administrators, this Court has more than enough to conclude that the purpose and effect of the BIRT is to purge the campus of "biased" speech.

A slight tweak in the facts of this case demonstrates the flaws in the University's position. Imagine that in the wake of the September 11th attacks, a public university

established a Patriotism Insufficiency Response Team, or PIRT, to foster a sufficiently patriotic "campus climate." If students witnessed "anti-American incidents" on campus, they could file a report and receive counseling and support about how to cope with unpatriotic actions. The PIRT would log the report in its records, share the allegation with others in the university, and contact the offending student to facilitate an "intervention" about why that student's anti-American actions were hurtful and how the student could be more patriotic in the future. No one could argue with a straight face that the PIRT did not even *implicate* the First Amendment and that no student would have standing to challenge it. The PIRT would instead be roundly criticized— and held unconstitutional—for what it is: a fundamentally coercive policy designed to deter students from expressing disfavored views.

**B.    The informational-activities policy likely violates the First Amendment.**

Virginia Tech's informational-activities policy is likely unconstitutional. This policy prohibits students from distributing pamphlets or gathering signatures in public places unless they obtain "prior approval" from the University and the activity is "sponsored by a university-affiliated organization." JA225. Contra the district court, the informational-activities policy likely violates the First Amendment in two ways: it imposes a prior restraint on protected speech, and it regulates speech based on the identity of the speaker. Because Speech First met its burden at this stage of the case, the district court should have enjoined enforcement of the policy.

### 1. The informational-activities policy is an unconstitutional prior restraint.

A prior restraint exists when a law or regulation gives "public officials the power to deny use of a forum in advance of actual expression." *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975). Although "[p]rior restraints are not per se unconstitutional," they are "highly disfavored and presumed invalid." *Weinberg v. City of Chicago*, 310 F.3d 1029, 1045 (7th Cir. 2002). Prior restraints cannot overcome this heavy presumption of illegality if they "place[] unbridled discretion in the hands of a government official or agency" or "fail[] to place limits on the time within which the decisionmaker must issue the license." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225-26 (1990).

Here, the informational-activities policy contains no such standards. Instead, the policy affords the University unbridled discretion to grant or deny requests to distribute literature or petition for signatures. JA225. The policy states only that the request will be "subject to university policies and the reasonable guidelines of the authorizing official." JA225. Nor does the policy impose time limits on when the University must grant or deny a student's application to speak on campus. JA225. The policy's lack of "narrow, objective, and definite standards" is dispositive. *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150-51 (1969); *see also Am. Entertainers, L.L.C. v. City of Rocky Mount*, 888 F.3d 707, 720 (4th Cir. 2018).

The district court refused to enjoin the informational-activities policy because it believed it needed a "more developed record" to conduct a "fact-intensive inquiry" into

whether the policy's restrictions are "reasonable as a matter of law." JA689. But no such inquiry is needed because the policy is *facially* unconstitutional. There is "broad agreement" that a policy violates the First Amendment when it "invest[s] governmental officials with boundless discretion over access to [a] forum." *Child Evangelism Fellowship of MD, Inc. v. Montgomery Cnty. Pub. Sch.*, 457 F.3d 376, 386 (4th Cir. 2006). Because the informational-activities policy "reserve[s] to [the university] unbridled discretion to permit or deny access to any speaker for any reason it chooses," the policy is unconstitutional on its face. *Id.* at 389.

This Court's decision in *Child Evangelism Fellowship* is directly on point. There, a public school district adopted a policy giving the school the discretion to approve or deny requests by private groups to send flyers home to the parents of elementary school students. *Id.* at 378-80. This Court found the policy to be an unconstitutional prior restraint because "*nothing* in the policy prohibits viewpoint discrimination, requires viewpoint neutrality, or prevents exclusion of flyers based on [the district's] assessment of the viewpoint expressed in a flyer." *Id.* at 388 (emphasis in original). That the school claimed it did "not include or exclude flyers based on its assessment of the viewpoints they express" was irrelevant. *Id.* at 387. All that mattered was "the plain language of the policy." *Id.* Because the policy itself failed to include proper "safeguards," it violated the First Amendment. *Id.* at 386.

*Weinberg v. City of Chicago* is similar. 310 F.3d 1029 (7th Cir. 2002). In that case, Chicago adopted an ordinance prohibiting individuals from selling books on public

sidewalks without a license. *Id.* at 1046. The Seventh Circuit found the ordinance unconstitutional because "[t]here [was] no language in [the] procedure which curtails the discretion of City officials in granting a license." *Id.* Although the City argued that the licensing procedure was a "mere formality in which officials simply determine whether the applicant has conformed to applicable provisions in the ordinance," the court found these assurances irrelevant. The court refused to "presume that officials will act in good faith and follow standards not explicitly contained in the ordinance." *Id.* Because the policy, on its face, provided no safeguards, it was an unconstitutional prior restraint.

So too here. The district court needed only to look at the text of the informational-activities policy to conclude that it was unconstitutional. Because the policy itself contains no narrow, objective, and definite standards constraining the university's discretion, the policy "does not sufficiently curtail the discretion of [University] officials in granting [approval] to [speak] and thus violates the law of prior restraint." *Id.* No additional "fact-specific inquiry" was needed.

Yet even if the "reasonable[ness]" of the policy's restrictions were somehow relevant, the lack of evidence in the record should have favored Speech First, not Virginia Tech. Speech First met its burden—it showed that its members want to "independently distribute literature about conservative ideas" but that they refrain from doing so because the informational-activities policy prohibits their desired expression. JA340-41, ¶20; JA350, ¶19. If Virginia Tech believes its restrictions are reasonable time,

place, and manner restrictions, it is *the University's* burden—not Speech First's—to "show[] that there is evidence supporting its proffered justification' for its speech restriction when asserting that the restriction survives the time, place, and manner analysis." *Horina v. City of Granite City, Ill.*, 538 F.3d 624, 633 (7th Cir. 2008); *see N.Y. Youth Club v. Town of Harrison*, 150 F. Supp. 3d 264, 272 (S.D.N.Y. 2015) ("Courts have struck down time, place, and manner restrictions where the government failed to set forth 'objective evidence' demonstrating that the restrictions served the interests asserted." (collecting cases)); *Edwards v. City of Coeur d'Alene*, 262 F.3d 856, 863 (9th Cir. 2001) ("[T]he First Amendment demands that [the government] provide 'tangible evidence' that speech-restrictive regulations are 'necessary' to advance the proffered interest[s]."). That Virginia Tech failed to do so should have weighed in Speech First's favor. *See Newsom ex rel. Newsom v. Albemarle Cty. Sch. Bd.*, 354 F.3d 249, 259-60 (4th Cir. 2003) (finding a likelihood of success on the merits because "there was no evidence presented at the preliminary injunction stage of the case" to justify the school's restriction on student speech).

### 2. The informational-activities policy is an unconstitutional speaker-based regulation

The informational-activities policy is also an unconstitutional speaker-based regulation. "Chief amongst the evils the First Amendment prohibits are government 'restrictions distinguishing among different speakers, allowing speech by some but not others.'" *Am. C.L. Union of N. Carolina v. Tennyson*, 815 F.3d 183, 186 (4th Cir. 2016)

(Wynn. J., dissenting). As the Supreme Court has recognized, "[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content," and are therefore "[p]rohibited" unless they satisfy strict scrutiny. *Citizens United v. Fed. Election Com'n*, 558 U.S. 310, 340 (2010).

Here, the informational-activities policy allows speech by one category of speakers (students who are members of university-affiliated organizations) and prohibits the same speech by others (students who are not members of university-affiliated organizations). *See* JA225. This is a classic speaker-based restriction. *See, e.g., Turning Point USA at Ark. State Univ. v. Rhodes*, 973 F.3d 868, 879 (8th Cir. 2020) ("[W]e cannot find the distinction between registered student organizations and individual students reasonable, when the sole justification offered for the distinction provides no meaningful reason for differentiating the two."). As a consequence, the informational-activities policy "may be justified only if the [University] proves that [the policy is] narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

As explained, however, the district court couldn't find that Virginia Tech could satisfy any level of review, much less strict scrutiny, because it lacked evidence that the university's restrictions were "reasonable as a matter of law." JA689-90. That should have been the end of the matter. *See Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 515-16 (4th Cir. 2002) (affirming preliminary injunction because the government provided "no evidence" justifying its speech restrictions); *Jones v. Jegley*, 947 F.3d 1100, 1107 (8th

Cir. 2020) (affirming preliminary injunction because state provided "no evidence" that speech restriction was "reasonable" in light of state's asserted interests). Because the University couldn't justify its speaker-based restrictions, the district court should have preliminarily enjoined the policy.

## II. If this Court agrees with Speech First on the likely merits, then it should grant a preliminary injunction.

As explained, the district court erred when it held that Speech First was unlikely to succeed. In some cases, that conclusion might lead this Court to simply vacate and remand, letting the district court assess any remaining preliminary-injunction factors. But this Court can also assess those factors. *E.g.*, *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 (4th Cir. 2013); *Steakhouse, Inc. v. City of Raleigh*, 166 F.3d 634, 637-38 (4th Cir. 1999). If they are satisfied, then this Court can enter a preliminary injunction itself, *e.g.*, *Scott v. Roberts*, 612 F.3d 1279, 1298 (11th Cir. 2010), or reverse with instructions to enter a preliminary injunction, *e.g., Newsom*, 354 F.3d at 252. This Court should do more than simply vacate here for two main reasons.

*First*, the preliminary-injunction factors can be resolved only one way. This appeal will resolve Speech First's likely success on the merits: the likely constitutionality of the informational-activities policy is before this Court, and the University offered no defense of its bias-incidents policy and BIRT aside from the standing arguments before this Court, *see* Doc. 15 at 27-28. Nor does a defense exist. If the BIRT chills speech, then the policy it enforces is subject to First Amendment scrutiny. The University has

never disputed that its bias-incidents policy is vague, overbroad, and viewpoint-discriminatory. *See* Doc. 4-1 at 18-20; Doc. 17 at 27.

Because the University's policies likely violate the First Amendment, the remaining preliminary-injunction factors necessarily follow. "[I]n the context of an alleged violation of First Amendment rights, a plaintiff's claimed irreparable harm is 'inseparably linked' to the likelihood of success on the merits of plaintiff's First Amendment claim." *WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009); *accord Elrod v. Burns*, 427 U.S. 347, 373 (1976) (the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"). And this Court has held that "the third and fourth … factors" for a preliminary injunction are also "established when there is a likely First Amendment violation." *Centro Tepeyac*, 722 F.3d at 191. "[A] state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional," and "upholding constitutional rights surely serves the public interest." *Giovani Carandola*, 303 F.3d at 521.

In short, the likely merits of Speech First's claims are dispositive. A "remand to allow the district court to weigh the preliminary-injunction factors in the first instance" would only waste resources because any denial of Speech First's motion would be an abuse of discretion. *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 589-90 (7th Cir. 2012).

***Second***, the district court already explained how it would resolve the remaining preliminary-injunction factors. When it enjoined the computer policy, the district court

agreed that the merits are decisive: "Violations of First Amendment rights constitute per se irreparable injury," "[g]iven this irreparable injury, the balance of equities tips in Speech First's favor," and "upholding constitutional rights surely serves the public interest." JA684 (citing *Giovani Carandola*, 303 F.3d at 520-21). That reasoning is unequivocal and applies equally to Speech First's other First Amendment claims. Requiring the district court to say it a second time serves no purpose. *Cf., e.g., Scott*, 612 F.3d at 1289, 1297 (entering a preliminary injunction where the district court had signaled how it would rule on the other factors, if its merits analysis were reversed).

For these reasons, the Court should enter a preliminary injunction itself. At a minimum, it should reverse with instructions for the district court to enter a preliminary injunction. The remaining factors are easily satisfied in this case, any balancing weighs heavily in favor of Speech First, and the harm from waiting clearly outweighs whatever interest the University has in delay.

## CONCLUSION

This Court should reverse the district court's denial of Speech First's motion for a preliminary injunction. This Court should enter a preliminary injunction barring the University from enforcing its bias-incidents policy and its informational-activities policy until the district court enters final judgment. At a minimum, this Court should remand with instructions to enter a preliminary injunction.

Dated: January 10, 2022

Respectfully submitted,

*/s/ J. Michael Connolly*
J. Michael Connolly
Cameron T. Norris
James F. Hasson
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
cam@consovoymccarthy.com
james@consovoymccarthy.com

*Counsel for Speech First, Inc.*

## STATEMENT REGARDING ORAL ARGUMENT

Because this case presents important and novel questions about the scope of free-speech protections on college campuses, Speech First respectfully requests oral argument.

## CERTIFICATE OF COMPLIANCE

This brief complies with Rule 32(a)(7)(B) because it contains 9,896 words, excluding the parts that can be excluded. This brief also complies with Rule 32(a)(5)-(6) because it has been prepared in a proportionally spaced face using Microsoft Word 2016 in 14-point Garamond font.

Dated: January 10, 2022                    */s/ J. Michael Connolly*

## CERTIFICATE OF SERVICE

I filed this brief with the Court via ECF, which will email everyone requiring notice.

Dated: January 10, 2022                    */s/ J. Michael Connolly*