No. 21-2061

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

SPEECH FIRST, INC.,

Plaintiff-Appellant,

v.

TIMOTHY SANDS, in his personal capacity and official capacity as
President of Virginia Polytechnic Institute and State University,

Defendant-Appellee.

On Appeal from the United States District Court
For the Western District of Virginia, No. 7:21-cv-00203 (Urbanski, J.)

## RESPONSE BRIEF OF APPELLEE
## TIMOTHY SANDS, IN HIS PERSONAL CAPACITY AND OFFICIAL
## CAPACITY AS PRESIDENT OF VIRGINIA POLYTECHNIC INSTITUTE
## AND STATE UNIVERSITY

Matthew B. Kirsner
William H. Hurd
ECKERT SEAMANS CHERIN
& MELLOTT, LLC
Suite 1300
919 East Main Street
Richmond, VA 23219
Tel: (804) 788-7744/9638
Fax: (804) 698-2950
Email: mkirsner@eckertseamans.com
        whurd@eckertseamans.com

Additional Counsel Listed on Inside Cover

Michael McAuliffe Miller
Renee Mattei Myers
ECKERT SEAMANS CHERIN
& MELLOTT, LLC
8th Floor
1 South Market Square Building
213 Market Street
Harrisburg, PA 17101-0000
Tel: (717) 237-7174/7163
Fax: (717) 237-6019
Email: mmiller@eckertseamans.com
          rmyers@eckertseamans.com

Jessica A. Glajch
ECKERT SEAMANS CHERIN
& MELLOTT, LLC
1717 Pennsylvania Avenue, NW
Suite 1200
Washington, D.C. 20006
Tel:    (202) 659-6672
Fax:    (202) 659-6699
E-mail:  jglajch@eckertseamans.com

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __21-2061__       Caption: Speech First, Inc. v. Timothy Sands

Pursuant to FRAP 26.1 and Local Rule 26.1,

TIMOTHY SANDS, in his individual capacity and official capacity as President of Virginia Polytechnic
(name of party/amicus)

Institute and State University

 who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?                    ☐YES ☑NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
      If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
      If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?                    ☐YES ☑NO
      If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Jessica Merry Samuels                              Date: _____10/07/2021_____

Counsel for: Defendant-Appellee

- 2 -

Print to PDF for Filing

**TABLE OF CONTENTS**

<u>Page</u>

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................ 1

JURISDICTIONAL STATEMENT ....................................................... 2

STATEMENT OF THE ISSUE ............................................................ 2

STATEMENT OF THE CASE ............................................................. 3

    I.    Virginia Tech Protects Free Speech ......................................... 3

    II.    The Informational Activities Policy ......................................... 9

    III.    Facts Showing the Lack of Standing ..................................... 12

SUMMARY OF ARGUMENT ........................................................... 14

STANDARD OF REVIEW ............................................................... 16

ARGUMENT ................................................................................ 17

    I.    Speech First Lacks Standing to Challenge the Bias-Related
        Incidents Protocol and BIRT ................................................ 17

        A.    Bias Response Teams Are Not *Per Se* Unconstitutional ................ 17

        B.    Under Virginia Tech's BIRT, Speech First Cannot Establish
            an Injury in Fact ................................................................ 19

            1.    The District Court Did Not Err In Its Factual Findings ........... 21

            2.    The District Court Correctly Concluded that Speech First
                Did Not Establish an Injury in Fact .......................... 24

            3.    Even if Speech First Could Show Standing, No
                Preliminary Injunction Should Be Issued .................. 30

II.   The District Court Correctly Concluded that Virginia Tech Should Not Be Preliminarily Enjoined from Enforcing Its Informational Activities Policy ............................................................................32

      A.   Virginia Tech Has Wide Latitude to Regulate Campus Access .......32

      B.   This Court Should Reject Speech First's Effort to Paint the Informational Activities Policy as an Invalid Prior Restraint .........37

      C.   The Preference for Recognized Student Organizations Is Constitutional ......................................................................................42

      D.   Speech First Has Attempted to Create a Novel Standard of Law to Apply to the Informational Activities Policy ......................50

           1.   Speech First Selectively Cites Inapposite Cases ......................50

           2.   Speech First Improperly Attempts to Shift The Burden of Proof ............................................................................................53

      E.   The Balance of Equities and Public Interest Disfavors the Injunction Sought by Speech First....................................................55

CONCLUSION ................................................................................................55

CERTIFICATE OF COMPLIANCE ...................................................................57

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Pastides*,
  900 F.3d 160 (4th Cir. 2018) ........................................................ 20, 24, 25, 27

*ACLU v. Mote*,
  423 F.3d 438 (4th Cir. 2005) ................................................................ 35

*Am. Entertainers, L.L.C. v. City of Rocky Mount*,
  888 F.3d 707 (4th Cir. 2018) ............................................................... 52

*Backpage.com, LLC v. Dart*,
  807 F.3d 229 (7th Cir. 2015) ............................................................... 26

*Bantam Books, Inc. v. Sullivan*,
  372 U.S. 58 (1963) ....................................................................... 25, 26

*Benham v. City of Charlotte*,
  635 F.3d 129 (4th Cir. 2011) ............................................................... 23

*Chaplinsky v. N.H.*,
  315 U.S. 568 (1942) ......................................................................... 8

*Child Evangelism Fellowship of Md., Inc. v. Montgomery County Pub. Sch.*,
  457 F.3d 376 (4th Cir. 2006) ........................................................... 34, 50

*Chiu v. Plano Indep. Sch. Dist.*,
  260 F.3d 330 (5th Cir. 2001) ............................................................... 33

*Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*,
  561 U.S. 661 (2010) ............................................................. 36, 44, 45, 48

*CIENA Corp. v. Jarrard*,
  203 F.3d 312 (4th Cir. 2000) ............................................................... 21

*Citizens United v. Fed. Election Comm's*,
  558 U.S. 310 (2010) ..................................................................... 43, 44

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) ........................................................................ 19

*Cornelius v. NAACP Legal Def. & Educ. Fund*,
   473 U.S. 788 (1985) ........................................... 32

*Edwards v. City of Coeur D'Alene*,
   262 F.3d 856 (9th Cir. 2001) ............................... 54

*Faulkner v. Jones*,
   10 F.3d 226 (4th Cir. 1993) ............................. 39, 40

*FW/PBS, Inc. v. City of Dallas*,
   493 U.S. 215 (1990) ........................................... 51

*Gilles v. Torgersen*,
   71 F.3d 497 (4th Cir. 1995) ............................. 35, 42

*Gilles v. Torgersen*,
   Civil No. 92-0933-R, 1995 U.S. Dist. LEXIS 8502
   (W.D. Va. Jan. 31, 1995) ................................... 35

*Glover v. Cole*,
   762 F.2d 1197 (4th Cir. 1985) ............................ 42

*Goldhamer v. Nagode*,
   621 F.3d 581 (7th Cir. 2010) ............................. 24

*Good News Club v. Milford Cent. Sch.*,
   533 U.S. 98 (2001) ........................................... 34

*Green v. City of Raleigh*,
   523 F.3d 293 (4th Cir. 2008) ............................. 38

*Greer v. Spock*,
   424 U.S. 828 (1976) ...................................... 37, 38

*Hague v. CIO*,
   307 U.S. 496 (1939) ........................................... 38

*Horina v. City of Granite City*,
   538 F.3d 624 (7th Cir. 2008) ............................. 54

*Int'l Union v. Brock*,
   477 U.S. 274 (1986) ........................................... 19

*Laird v. Tatum*,
   408 U.S. 1 (1972) ........................................... 24

*Leaders of a Beautiful Struggle v. Balt. Police Dep't*,
2 F.4th 330 (4th Cir. 2021) ......................................................... 16, 39

*Lovell v. City of Griffin*,
303 U.S. 444 (1938) ........................................................................ 38

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ........................................................................ 21

*Minn. Voters All. v. Mansky*,
585 U.S. ___, 138 S. Ct. 1876 (2018) ............................................. 33

*Mt. Valley Pipeline, LLC v. 6.56 Acres*,
915 F.3d 197 (4th Cir. 2019) .......................................................... 16

*New York Youth Club v. Town of Harrison*,
150 F. Supp. 3d 264 (S.D.N.Y. 2015) ............................................ 54

*Newsom v. Albemarle Cty. Sch. Bd.*,
354 F.3d 249 (4th Cir. 2003) .......................................................... 54

*Nken v. Holder*,
556 U.S. 418 (2009) ........................................................................ 30

*Okwedy v. Molinari*,
333 F.3d 339 (2d Cir. 2003) ........................................................... 26

*Pleasant Grove City v. Summum*,
555 U.S. 460 (2009) .................................................. 32, 33, 34, 36

*Police Dep't of Chicago v. Mosley*,
408 U.S. 92 (1972) .......................................................................... 38

*Quince Orchard Valley Citizens Ass'n v. Hodel*,
872 F.2d 75 (4th Cir. 1989) ............................................................ 16

*Real Truth About Obama, Inc. v. FEC*,
575 F.3d 342 (4th Cir. 2009) .......................................................... 30

*Reed v. Town of Gilbert, Ariz.*,
576 U.S. 155 (2015) ................................................................... 43, 44

*Regents of Univ. of Cal. v. Bakke*,
438 U.S. 265 (1978) ................................................................... 31, 55

*Shuttlesworth v. City of Birmingham*,
    394 U.S. 147 (1969) ................................................................. 52

*Southeastern Promotions, Ltd. v. Conrad*,
    420 U.S. 546 (1975) ...................................................... 35, 50, 51

*Speech First, Inc. v. Killeen*,
    968 F.3d 628 (7th Cir. 2020) ...................................... 19, 23, 28, 29

*Speech First, Inc. v. Schlissel*,
    939 F.3d 756 (6th Cir. 2019) .............................................. 27, 28

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ............................................................ 19, 24

*Trump v. Thompson*,
    No. 21-5254, 2021 U.S. App. LEXIS 36315 (D.C. Cir. Dec. 9, 2021) ............ 30

*Turning Point USA at Arkansas State Univ. v. Rhodes*,
    973 F.3d 868 (8th Cir. 2020) .................................................. 49

*Va. Hosp. & Healthcare Ass'n v. Kimsey*,
    493 F. Supp. 3d 488 (E.D. Va. 2020) ........................................ 19

*Virginia v. Black*,
    538 U.S. 343 (2003) ............................................................. 8

*Walton v. Johnson*,
    440 F.3d 160 (4th Cir. 2006) ................................................. 16

*Weinberg v. City of Chicago*,
    310 F.3d 1029 (7th Cir. 2002) ............................................... 51

*Widmar v. Vincent*,
    454 U.S. 263 (1981) ................................................... 34, 36, 51

*Winter v. NRDC, Inc.*,
    555 U.S. 7 (2008) ......................................................... 15, 30

## Statutes

Va. Code Ann. § 18.2-416 ...................................................... 8

Va. Code Ann. § 18.2-417 ...................................................... 8

Va. Code Ann. § 18.2-423 ...................................................... 8

vi

Va. Code Ann. § 18.2-423.1 ...................................................................... 8

Va. Code Ann. § 18.2-423.2 ...................................................................... 8

Va. Code Ann. § 23.1-401.1 ...................................................................... 7

## Other Authorities

https://policies.vt.edu/speechoncampus.html ........................................... 7

The Defendant-Appellee, Timothy Sands, files this brief on behalf of himself and Virginia Polytechnic Institute and State University ("Virginia Tech" or "the University"), and in opposition to the appeal by Speech First, Inc. ("Speech First").

## **INTRODUCTION**

Free speech and civility:  both are essential to our republic.  As an institution of higher education, Virginia Tech seeks to safeguard both and to inculcate both. This is why the University has two complementary sets of policies, one dealing with incidents of bias and the other dealing with incidents that infringe on free speech.

To be clear at the outset, Virginia Tech examines every bias complaint through the lens of constitutionally protected speech, and it does not adjudicate matters involving protected speech.

The complaint against Virginia Tech's bias policies must die at the threshold. Speech First lacks standing to challenge them.  Even if it had standing, it would not be able to meet the other requirements for a preliminary injunction.

As for the "informational activities policy," Speech First's members have an easy route to passing out leaflets on campus.  Yet, they apparently prefer litigating about leaflets to actual leafletting.  In any event, the appeal must fail here as well, especially given the lack of any content-based discrimination by Virginia Tech and the other available avenues of communication.

In addition to the other flaws in Speech First's case, the requested preliminary injunction would injure Virginia Tech's ability to advance its mission as an institution of higher education, which is also a special concern of the First Amendment. The balance of equities and public interest weigh against any such result.

Speech First complains about events at other institutions. But, the only institution in this case is Virginia Tech. Its policies are its own. Those policies are constitutional.

## JURISDICTIONAL STATEMENT

This Court lacks subject matter jurisdiction to enter injunctions against the bias policies or the information activities sponsorship requirement. Speech First lacks standing to challenge them. Otherwise, Virginia Tech agrees with Speech First's jurisdictional statement.

## STATEMENT OF THE ISSUE

I.   The District Court concluded that Speech First lacks standing to challenge the bias-related incidents protocol and the Bias Intervention and Response Team ("BIRT"). Did the District Court act within its discretion when it declined to issue a preliminary injunction on this basis?

II.  The District Court concluded that Speech First failed to show that it was likely to succeed on its claim that Virginia Tech's informational activities policy

2

violates the First Amendment.  Did the District Court act within its discretion

when it declined to issue a preliminary injunction on this basis?

**III.**    Does the record provide additional reasons to affirm the decision of the

District Court in declining to issue a preliminary injunction?

## <u>STATEMENT OF THE CASE</u>

**I.**    <u>**Virginia Tech Protects Free Speech.**</u>

> Virginia Tech is a community where the free and civil exchange of
> ideas is valued and every person's perspective is important.  ***Freedom***
> ***of speech in the United States is protected by the First Amendment*** ….
> Free speech provisions protect many forms of intolerant statements,
> expressions, and conduct.
>
> \* \* \* \* \*
>
> BIRT will examine and review each complaint through the ***lens of free***
> ***and protected speech.*** … ***Virginia Tech cannot adjudicate matters***
> ***that are deemed protected speech***.

JA370 (Virginia Tech document describing BIRT process) (emphasis added).

Speech First begins by complaining about what it claims is happening at

"colleges and universities across the country," rather than focusing on Virginia Tech.

App. Br. at 3.  For example, Speech First lists some unfortunate episodes where

"[s]tudents have been reported to bias response teams" for speech protected by the

First Amendment.  *Id*.  But *each* of those episodes occurred outside of Virginia

Tech—indeed, outside of Virginia.  JA252-55.  Similarly, Speech First details how

it claims university bias response teams are "usually staffed" and "typically" operate. App. Br. at 3.  But what is relevant here is how Virginia Tech's BIRT operates.

Left out by Speech First is the sworn statement of Byron Hughes, Virginia Tech's Dean of Students, who "oversaw the development of BIRT without consulting or reviewing any so-called 'bias teams' at other colleges and universities."  JA355.[1]  Thus, "[Virginia Tech's] BIRT procedures are unique to Virginia Tech and the Dean of Students, and they are not modeled after any other structure at other institutions." *Id.*  Regardless of how "bias teams" may "typically" operate elsewhere, Virginia Tech's procedures are the only ones at issue here, and Virginia Tech's BIRT operates within very narrow limits:

- "BIRT [does not] make any adjudication or responsibility finding."

- "BIRT does not have the power to impose discipline on any student for any reason."

- "Nothing about BIRT's interaction with a student—as either a complaining party or a responding party—would ever appear on either a student's academic transcripts or disciplinary record."

---

[1]    Dr. Hughes became Dean of Students in October 2018; BIRT was created the following year.  JA353, JA355.  The goal was to provide a more coordinated structure to support students and Virginia Tech's "Principles of Community," to avoid duplication, and to reduce confusion about reporting bias incidents. JA355. The procedures outlined in the 2016 protocol "are no longer in effect."  JA655 (District Court's Opinion).

4

- "Records and correspondence associated with BIRT are housed within [the Dean of Students'] office and may only be shared with [the] Student Conduct [Office] on a need-to-know basis."

JA361.

So then, what does BIRT do?  To begin, it is unusual for BIRT or the Dean of Students to respond directly to a bias complaint.  Instead, when a complaint implicates another university office's jurisdiction, it is referred to that office.  *See* JA360.  And, where BIRT or the Dean of Students does respond directly, the response is benign:

> [BIRT or the Dean of Students responds] by contacting both the reporting student and the responding student by letter or email to ***invite*** them to engage in a ***voluntary conversation*** with [the Dean of Students] or a member of [the Dean's] office.  If a student fails to respond to this message, or declines to meet with our Office, ***no further action*** is taken, and the student ***faces no consequences*** of any kind.

JA360-61 (emphasis added).

According to Speech First, "[Virginia Tech's] records reveal that the vast majority of bias-incident ***reports*** involve protected speech," and it cites three reports from fall of 2018, presumably the "worst" it could find.  App. Br. at 7-8 (emphasis added).  But nowhere does Speech First's brief claim that Virginia Tech took ***any***

*action*–much less ***unconstitutional action***–against the speakers involved.[2]  The omission is telling.  The First Amendment right "to petition the Government for a redress of grievances" is not limited to grievances that are meritorious.  Students and faculty may complain to a public university about all manner of things, but unless the university takes adverse action, it is difficult to see how anyone's constitutional rights have been violated.

Also telling is the Dean of Student's description of a report where BIRT did take action, though ***not*** against the allegedly biased student:

> BIRT received a report from a professor regarding a student who displayed a flag, typically associated with conservative viewpoints, that the professor found objectionable in the background of the student's camera view during a Zoom meeting.  The members of BIRT declined to take any action in response to the complaint and ***informed the reporting professor that displaying a flag constitutes free speech***.

JA358 (emphasis added).  This episode is just one example.  "BIRT regularly declines to pursue complaints of bias because the underlying conduct involved speech protected by the First Amendment."

"Part of [BIRT's] initial threshold evaluation of whether a complaint implicates bias is consideration of whether the complaint addressed speech protected under the First Amendment …."  *Id.*  Even where constitutionally protected speech

---

[2]    "Speech First does not allege that Virginia Tech treated any of these reports as violations of the Bias-Related Incidents Protocol or the Student Code of Conduct."  JA658 (District Court Opinion).

involves commentary widely regarded as offensive, the rule at Virginia Tech is that the Constitution prevails. As explained by one BIRT member: "Where BIRT determines that a report involves constitutionally protected speech, the Dean of Students Office typically attempts to follow up with the ***reporting*** student …." JA395 (emphasis added). Moreover, "BIRT ***regularly*** concludes that reports of alleged bias [are] constitutionally protected speech." *Id.* (emphasis added).

Speech First also ignores Virginia Tech's other initiatives to protect free speech on campus. As the Dean of Students noted, under Virginia law, "no public institution of higher education shall abridge the constitutional freedom of any individual, including enrolled students, faculty and other employees, and invited guests, to speak on campus." JA363 (quoting Va. Code § 23.1-401.1(A)).

As the Dean also stated:

> [Each public institution of higher education] must also establish "in its student handbook, on its website, and in its student orientation programs policies regarding speech that is constitutionally protected under the First Amendment to the United States Constitution and the process to ***report incidents of disruption of such constitutionally protected speech***."

*Id.* (quoting Va. Code § 23.1-401.1(B)) (emphasis added).

Virginia Tech "fastidiously complies" with these requirements and "establish[ed] a website to facilitate reporting incidents affecting the freedom of expression." *Id.* (citing printout of website, https://policies.vt.edu/speechoncampus.html). The website quotes the First

7

Amendment, affirms Virginia Tech's support for the First Amendment, and provides a form for reporting "an incident of disruption of constitutionally protected speech." JA374. When submitted, such forms are "forwarded directly to the Dean of Students Office to take action and respond …." JA363.

Finally, Speech First expresses alarm that BIRT includes members of the Virginia Tech Police Department ("VTPD") (App. Br. at 5), implying that those officers are somehow acting as Orwellian speech police. But, as any constitutional scholar knows, some categories of "speech" are not constitutionally protected.[3] Accordingly, Virginia has enacted several criminal statutes that prohibit certain types of *unprotected* speech.[4] Other crimes–whether against persons or property–do not become acceptable merely because the perpetrator wanted to express an idea. Thus, there are occasions when referral to law enforcement is appropriate.

---

[3]     *See, e.g., Virginia v. Black*, 538 U.S. 343, 359 & 363 (2003) (noting that "true threats" are not constitutionally protected and upholding Virginia's authority to ban cross-burning with intent to intimidate); *Chaplinsky v. N.H.*, 315 U.S. 568, 571-72 (1942) (explaining that unprotected categories of speech include "the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words -- those which by their very utterance inflict injury or tend to incite an immediate breach of the peace").

[4]     *See, e.g.,* Va. Code § 18.2-416 (penalizing cursing and abusive language when reasonably calculated to provoke a breach of the peace); § 18.2-417 (penalizing certain acts of slander and libel); § 18.2-423 (prohibiting cross burning with intent to intimidate); § 18.2-423.1 (prohibiting placing swastika on certain property with intent to intimidate); § 18.2-423.2 (prohibiting display of noose with intent to intimidate).

"VTPD will only become involved in a bias incident when the alleged facts credibly describe unlawful activity or otherwise necessitate a law enforcement response." JA356. "Complaints alleging criminal activity, such as assault or the destruction of property, are referred to the [VTPD]." JA359.

The Dean of Students described a useful example: "BIRT … received and responded to reports of political signs for former President Donald Trump being torn down around campus. Because those complaints alleged the criminal destruction of property, the complaints were referred to [VTPD] for follow-up and resolution." JA362-63. Such diligence in protecting the free speech rights of President Trump's supporters belies any insinuation that Virginia Tech is a hotbed of political correctness as implicitly alleged by Speech First.

## II.    **The Informational Activities Policy**

Speech First insinuates that only groups whose views the University finds palatable will be given access to the campus to hand out leaflets or collect petition signatures. App. Br. at 9-10. The record shows otherwise.

Heather Wagoner is Director of Student Engagement and Campus Life ("SECL"), and her Declaration describes the wide spectrum of student organizations recognized by Virginia Tech: between 750 and 850 in any given semester. JA400; JA402. Some have a "political focus" and cover "a remarkable breadth of views and advocacy interests." JA402. Some are "left-leaning or liberal." JA402; JA402-04

9

(examples). Others are "right-leaning or conservative." JA405; JA405-07 (examples).

Speech First is not among Virginia Tech's many recognized student organizations ("RSOs"), but if it wanted to become recognized, it would have no problem doing so. *See* JA423 (describing process). As Dr. Wagoner explains: "There are only two requirements for students to form a new RSO: 5 students who will join the organization, and a unique purpose that the organization will serve—that is, a proposed new RSO cannot serve exactly the same purpose as an existing RSO." JA401. Indeed, "SECL staff make no content-based decision with regard to recognizing new RSOs." *Id.* During the nearly six years that Dr. Wagoner has served as Director of SECL, "SECL staff have never denied a student's request to form a new RSO." JA400-01. "Between 30 and 60 new RSOs are formed each year." JA401. Speech First could easily become the next one. They need only apply.

Virginia Tech is also non-judgmental in giving students access to university space for "informational activities," defined as "***distribution of literature*** and/or ***petitioning for signatures*** where no fee is involved nor donations or contributions sought." JA225 (emphasis added).[5] Speech First insinuates that Virginia Tech

---

[5]    Monetary solicitations are subject to other policies not at issue here.

censors speech it disfavors by denying access for informational activities. The record shows otherwise.

Leafletting by RSOs is allowed at "numerous 'tabling' locations across Campus" and, while these locations must be reserved in advance, they are "free of charge and are provided *without regard to the content* of the proposed informational activity on a *first come, first served* basis." JA419-20 (emphasis added). As Dr. Wagoner also explains: "Importantly, the 'approval' required from SECL to conduct informational activities is *merely to make a reservation*—there is no application process, and SECL *does not exercise any discretion* in deciding which RSOs will be permitted to use University spaces." JA420 (emphasis added). While Speech First overlooked these facts, the District Court did not. JA685-86.

Dr. Wagoner explained some reasons for the policy.

- "First, the informational activities policy facilitates and protects First Amendment activities on Campus. Space and resources on Campus are limited and must be shared. Requiring registration to use these limited resources ensures fair and equitable access, no matter the content of the planned speech. For the same reason, registration to engage in informational activities is limited to official organizations so that Virginia Tech's limited physical resources can be used for the benefit of the most students."

- "Second, an event management system, including for leafletting and tabling activities, allows student groups to access high-traffic areas of Campus without impeding student movement (for example, by blocking the exits to busy classrooms) or invading student living spaces (for example, soliciting door to door in residence halls)."

11

- "Third, this policy ensures the University is aware of the activities occurring on Campus, allowing it to adequately provide for the safety and other needs of its students."

- "Finally, by requiring registration to use these communal spaces, the informational activities policy holds RSOs accountable for limiting the amount of litter resulting from their leafletting, flyering, and other activities."

- "Fundamentally, these policies facilitate First Amendment activities while protecting University assets and interests—both the physical spaces and the human resources required to clean up and/or address unauthorized or otherwise disruptive activities."

JA420-21.

## III.  Facts Showing the Lack of Standing

Speech First claims associational standing based on the alleged standing of three individual members, Students A, B and C (the "Students").  But, for most issues on appeal, those members lack standing.

**Bias-Related Incident Protocol and BIRT:** The Students hold conservative or conservative/libertarian views they regard as "unpopular, controversial, and in the minority on campus."  JA337, JA342, JA347.[6]  Each Student contends that he/she "want[s] to engage in open and robust intellectual debate," to "speak passionately and repeatedly about [those views]," and "to point out the flaws in fellow students'

---

[6]     Students A and C were juniors when the lawsuit was filed in April of 2021. JA337, JA347.  Student B then was a senior.  JA342.  Student B has graduated. JA640.  An injunction cannot afford him any relief.

12

arguments and encourage them to change their minds or, at a minimum, to understand [those views.]." JA339, JA344, JA348. They claim to be chilled in expressing their views out of fear that they will be reported to Virginia Tech and that university officials will take action against them.

Yet, Speech First provides no example of anyone being subjected to adverse action by the University for doing what the Students say they want to do. Nor does Speech First present any evidence that BIRT does not substantially function in the manner Virginia Tech officials describe.[7] Moreover:

> Speech First has not made a clear showing that the protocol and BIRT objectively chill speech at Virginia Tech because they ***do not proscribe anything***. Speech First has put on no evidence that students feel obligated to come to these voluntary meetings, nor do [the Students] declare that they would feel obligated to attend such a meeting if invited.

JA661-62 (District Court Opinion) (emphasis added). Thus, as the District Court found, "Speech First lacks standing to challenge the protocol and BIRT." JA659 (District Court Opinion).

---

[7] The District Court mentions two instances where matters were referred to the Student Conduct Office for consideration of charges, but where no charges were brought because that office found that "the speech was constitutionally protected and not harassment under the Student Code." JA658. Although Speech First attempts to paint these types of referrals as threats, they actually provide yet another layer of protection for the First Amendment rights of students at Virginia Tech.

**Informational Activities Policy (Sponsorship Rule):** The District Court said, incorrectly, that a student must be "required to ***join*** a student organization" in order to distribute literature or collect petition signatures. JA688 (emphasis added). Membership and sponsorship are different. At most, the informational activities policy requires *sponsorship* by a "university-affiliated organization," which includes RSOs as well as university offices, departments, and faculty members. There is no evidence that, among the university's 750 to 850 RSOs–including clearly conservative ones (JA405-07)–*none* would sponsor the leaflets these Students want to distribute.[8] Nor is there evidence that Speech First could not obtain sponsorship from any other type of university-affiliated organization. Even if RSO membership were required to distribute literature or collect petition signatures, the Students are members of Speech First (JA337, JA342, JA347), and Speech First has presented no evidence that its Virginia Tech group could not easily become an RSO, thereby allowing the Students ready access to "tabling" sites. *See supra* at 10 (describing recognition process).

## SUMMARY OF ARGUMENT

Speech First challenges the bias-related incidents protocol and BIRT, but it lacks standing to do so—as the District Court correctly found. What matters here

---

[8]    RSOs may sponsor informational activities unrelated to their official purpose. The Chess Club could sponsor leaflets criticizing the government's immigration policies; the Cave Club could sponsor leaflets supporting those policies.

are *Virginia Tech's* policies and practices, not those of other schools, and Virginia Tech vigorously protects the First Amendment. There is no evidence that anyone has been harmed by the University—or threatened with harm—for exercising First Amendment rights. Speech First's claim that BIRT poses a credible threat of harm assumes a process that does not exist at Virginia Tech. BIRT has no disciplinary authority whatsoever. The Circuit Court opinions cited by Speech First involve materially different records, conflict with precedent in this and other circuits, and are otherwise flawed.

Even if Speech First had standing, the sweeping preliminary injunction it seeks would not meet the applicable *Winter*[9] standard for such extraordinary relief, especially given the balance of equities and harm to the public interest. For all these reasons, the District Court did not abuse its discretion in declining to issue a preliminary injunction.

Speech First also appeals the District Court's decision not to grant a preliminary injunction against Virginia Tech's informational activities policy, which involves allocation of space for distributing literature and collecting petition signatures. Insofar as Speech First challenges the sponsorship requirement, it lacks standing because that requirement does not present a significant obstacle to students who want to engage in informational activities. In any event, Speech First is unlikely

---

[9]　　*See Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008).

to prevail on the merits. The informational activities policy is a reasonable time, place and manner regulation of a non-public forum, especially given (i) the lack of any content or viewpoint discrimination, (ii) the alternative avenues of communication, and (iii) the latitude constitutionally available to public universities.

Again, the requested injunction does not meet the applicable standard, especially given the balance of equities and harm to the public interest. There was no error in declining to grant an injunction.

## STANDARD OF REVIEW

The decision to issue or deny a preliminary injunction is committed to the sound discretion of the trial court. *Quince Orchard Valley Citizens Ass'n v. Hodel*, 872 F.2d 75, 78 (4th Cir. 1989). This Court reviews a district court's denial of a preliminary injunction for abuse of discretion, reviewing factual findings for clear error and legal conclusions *de novo*. *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 339 (4th Cir. 2021).

"[A]buse of discretion is a deferential standard, and so long as 'the district court's account of the evidence is plausible in light of the record viewed in its entirety, [the Court] may not reverse'" even if it is "'convinced that … [it] would have weighed the evidence differently.'" *Mt. Valley Pipeline, LLC v. 6.56 Acres*, 915 F.3d 197, 213 (2019) (citing *Walton v. Johnson*, 440 F.3d 160, 173 (4th Cir. 2006)).

16

# ARGUMENT

## I. Speech First Lacks Standing to Challenge the Bias-Related Incidents Protocol[10] and BIRT.

### A. Bias Response Teams Are Not *Per Se* Unconstitutional.

By dwelling on events at other public universities, Speech First and some amici apparently wish the Court to view Virginia Tech's bias-related procedures with a jaundiced eye and presume that the University is inflicting constitutional harm. But, Virginia Tech deserves to be judged on its own merits. There is no such harm here, and Speech First has no standing.

Bias response teams are not *per se* unconstitutional, as acknowledged by an amicus, the Foundation for Individual Rights in Education ("FIRE"). "To the extent that Bias Response Teams are used to better understand students' perspectives, to prepare general programming to constituents of the institution, or to provide resources to a complaining student, these goals are unobjectionable on First Amendment grounds." JA258 (citing FIRE Report). Consistent with this approach, at Virginia Tech, BIRT "serve[s] as a central repository for complaints about and improvements to all aspects of the student experience—bias-related or not." JA356.

The most salient aspects of BIRT are described in the Statement of Facts, *supra* at 3-14, and they show a process that is constitutionally benign. Virginia Tech

---

[10]     As noted in footnote 1, *supra* at 4,* and in the District Court's opinion (JA655), the protocol is no longer in use and was replaced by BIRT.

recognizes that the First Amendment protects many statements, expressions and types of conduct that some would consider intolerant. Thus, as noted above, BIRT's initial review of a complaint includes an evaluation of whether the complaint addresses speech protected by the First Amendment. JA358.

Complaints that primarily implicate the concerns of other university offices are referred elsewhere. Only cases that independently implicate a violation of the Student Code of Conduct are referred to the Office of Student Conduct (*e.g.,* bias motivated speech accompanied by physical violence, stalking, threats and/or sexual harassment). JA378; JA382. When this occurs, violations are addressed through the student disciplinary process, not BIRT. JA382. Absent such aggravating circumstances, speech is never charged as a Student Code violation or handled through the student disciplinary process. Where the Dean of Students is the appropriate office to handle the complaint, the office contacts both the reporting student and the responding student to invite them to engage in a *voluntary conversation*. JA360-61; JA387. A student who fails to respond to the invitation or declines to meet faces no consequences of any kind. JA361. Nothing about BIRT's interaction with a student ever appears on a student's academic transcript or disciplinary record. *Id.* In an earlier day—or on a smaller campus—such efforts to teach civility and promote peace between students might have been conducted more informally. But giving the process a name ("BIRT")—and developing some written

procedures for a large campus (over 34,000 students) does not change the essential character of the endeavor, and there is nothing unconstitutional about it.

### B. Under Virginia Tech's BIRT, Speech First Cannot Establish an Injury in Fact.

Under the associational standing doctrine, an organization like Speech First has standing only if its members do. *Int'l Union v. Brock*, 477 U.S. 274, 289-90 (1986). A plaintiff bears the burden of establishing standing for each type of relief sought. *Va. Hosp. & Healthcare Ass'n v. Kimsey*, 493 F. Supp. 3d 488, 492 (E.D. Va. 2020) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983)). Here, Speech First has that burden.

In order to establish Article III standing, a plaintiff must show: (1) "injury in fact;" (2) a causal connection between the injury and challenged conduct; and (3) a likelihood that the injury will be redressed by a favorable decision. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014). "When a party seeks a preliminary injunction before the district court, the burden rests on that party to demonstrate that it has standing to pursue its claims." *Speech First, Inc. v. Killeen*, 968 F.3d 628, 632 (7th Cir. 2020) (holding that Speech First—same plaintiff as here—"failed to demonstrate that its members face a credible fear that they will face discipline on the basis of their speech"). Here, as in *Killeen*, "Speech First must set forth by affidavit or other evidence ***specific facts***, rather than general factual allegations of injury." 968 F.3d at 638 (cleaned up) (emphasis added).

19

This Court has "recognized two ways in which litigants may establish the requisite ongoing injury when seeking to enjoin government policies alleged to violate the First Amendment." *Abbott v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018):

> First, they may show that they intend to engage in conduct at least arguably protected by the First Amendment but also proscribed by the policy they wish to challenge, and that there is a ***credible threat*** that the policy will be enforced against them when they do so. …
>
> Second, they may refrain from exposing themselves to sanctions under the policy, instead making a sufficient showing of self-censorship - establishing, that is, a ***chilling effect*** on their free expression that is objectively reasonable. …
>
> Either way, a credible threat of enforcement is critical; without one, a putative plaintiff can establish neither a realistic threat of legal sanction if he engages in the speech in question, nor an ***objectively good reason*** for refraining from speaking and ***self-censoring*** instead.

*Id.* (cleaned up) (emphasis added).

The District Court concluded that Speech First could not meet either part of the test and, thus, lacked standing to challenge BIRT. The only evidence Speech First introduced were conclusory statements from anonymous students who purportedly believe that expressing their views on (very generally-described) topics could result in their being reported, investigated, and punished by BIRT for engaging in a bias-motivated incident. The District Court gave those statements little weight, finding more informative the detailed statements from university staff who are personally involved with BIRT and consistently describe how BIRT operates.

Speech First's caricatures of BIRT cannot be squared with the reality of these processes, as evidenced by the factual findings of the District Court. *See* App. Br. at 5-8. Given Speech First's burden to provide "specific facts" rather than "mere allegations," *Lujan v. Defenders of Wildlife (Lujan II)*, 504 U.S. 555, 561 (1992), the Court cannot indulge Speech First's fiction.

After evaluating the evidence and making well-grounded factual findings, the District Court correctly determined that Speech First failed to meet the first part of the "injury in fact" test because Virginia Tech's BIRT does not "proscribe" anything. JA659. The record evidence clearly establishes that BIRT is not disciplinary in nature and that the Dean of Students office maintains no disciplinary authority. The District Court also correctly concluded that Speech First cannot show an objectively reasonable chilling effect on the speech of its members.

### 1. The District Court Did Not Err In Its Factual Findings.

The District Court's factual findings should not be overturned because Speech First cannot establish clear error. *CIENA Corp. v. Jarrard*, 203 F.3d 312, 322 (4th Cir. 2000) (stating that district court findings must stand unless the reviewing court "is left with the definite and firm conviction that a mistake has been committed"). Speech First fails to meet this demanding standard and the District Court's factual findings must stand.

The District Court made specific findings about BIRT in support of its determination that Speech First lacks standing. First, "BIRT lacks any authority to discipline or otherwise punish students for anything." JA659. Speech First points to no contrary evidence. Instead, it offers a *non sequitur*: that BIRT can refer reports about incidents that also violate the Student Code or the law to offices with disciplinary authority.[11] App. Br. at 26. But, that possibility does not change the fact that BIRT itself lacks disciplinary and investigative functions, and that protected speech does not violate the Student Code of Conduct or the law, and thus, it is not subject to referral.

Next, the District Court found that "[a]ll that BIRT has the authority to do is 'invite' students or participate in 'voluntary conversations.'" JA659. While Speech First claims the opposite is true (App. Br. at 27), "Speech First has put on no evidence that students feel obligated to come to these voluntary meetings, nor do [the Students] declare that they would feel obligated to attend such a meeting if invited." JA661-62 (District Court Opinion). In light of this evidence, Speech First's insistence that "no student" would regard the invitation as voluntary is untenable, and its speculation about "impressionable 18- to 22-year-olds," (App. Br. 27), rings hollow.

---

[11]    Indeed, as noted *infra* at footnote 12, anyone can refer a matter to Student Conduct or VTPD.

Furthermore, the District Court found that "should a student fail to respond to BIRT's invitation or decline to meet, 'no further action is taken, and the student faces no consequences of any kind.'" JA659 (citing JA360). While Speech First argues that speech is chilled because the university maintains reports of complaints, the District Court noted that, at most, DOS will "record the incident within the secure DOS reporting system." *Id.* Reports to BIRT are not recorded on the academic transcripts or disciplinary reports of students. JA361. Indeed, nothing in the record shows that any individual student reasonably should fear the consequences of an invitation to meet with BIRT or the consequences of declining that invitation, and would have self-censored because of those fears. *See Killeen*, 968 F.3d at 640.

Speech First cannot claim standing based on the Students' *misunderstanding* of how BIRT operates, and given how BIRT *actually* operates (which the Students' affidavits do not consider), it is not plausible that the Students would self-censor because of BIRT. Surely, they would not be so sensitive. In any event, "*[s]ubjective* or speculative accounts of such a chilling effect … are not sufficient. … Any chilling effect … must be ***objectively*** reasonable." *Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir. 2001) (cleaned up) (emphasis added). Speech First has no standing because BIRT will not "deter a person of ordinary firmness from the exercise of First Amendment rights." *Id.*

23

## 2. The District Court Correctly Concluded that Speech First Did Not Establish an Injury in Fact.

The District Court correctly applied settled law to the facts of this case. Where, as here, Speech First fails to show that its members "have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible, [it does] not allege a dispute susceptible to resolution by a federal court." *Goldhamer v. Nagode*, 621 F.3d 581, 586 (7th Cir. 2010) (cleaned up).

An invitation to a voluntary, non-disciplinary meeting is not only insufficient to confer standing, but fails to implicate the First Amendment at all. *Laird v. Tatum*, 408 U.S. 1, 11 (1972) (concluding that plaintiff must be subject to an "exercise of governmental power" that is "regulatory, proscriptive, or compulsory"). For much the same reason, any theoretical fear that led Speech First's anonymous members to self-censor—based on the possibility of a voluntary, non-disciplinary meeting—is merely illusory and does not establish an injury in fact. *See Susan B. Anthony List*, 573 U.S. at 158.

This Court's decision in *Abbott*, 900 F.3d 160 is directly on point here. In *Abbott*, a student (Abbott) was required to meet with university officials after he coordinated a "Free Speech Event" that drew complaints from other students alleging sexist and racist statements. *Id.* at 163. The purpose of the meeting was to

determine whether an investigation was warranted, and after speaking with Abbott, the university concluded it was not. *Id.* at 166.

Nonetheless, Abbott and others sued the university for allegedly violating their First Amendment rights. *Id.* at 163. They argued that the prospect of such meetings in the future chilled their speech. *Id.* at 169. The Court disagreed, stating:

> Even an objectively reasonable "threat" that the plaintiffs might someday have to meet briefly with a University official in a non-adversarial format, to provide their own version of events in response to student complaints, cannot be characterized as the equivalent of a credible threat of "enforcement" or as the kind of "extraordinarily intrusive" process that might make self-censorship an objectively reasonable response.

*Id.* at 179.

*Abbott* applies here. Indeed, if a *mandatory* meeting to explore whether a full-blown investigation is necessary does not constitute injury in fact, then, *a fortiori*, invitations for *voluntary* meetings fail to do so.

Moreover, Speech First's principal authorities are irrelevant. Each case involved an unmistakable threat that the government would harm the plaintiff if it persisted in its protected speech. *See* App. Br. at 20-23. For example, in *Bantam Books v. Sullivan*, 372 U.S. 58 (1963), the Rhode Island Commission to Encourage Morality in Youth sent 35 notices to the plaintiff, stating that particular publications were objectionable. *Id.* at 59-61. These notices were "phrased virtually as orders, reasonably understood to be such by the distributor, invariably followed up by police

25

visitations, [and] in fact stopped the circulation of the listed publications *ex proprio vigore*." *Id*. at 68.

Similarly, *Okwedy v. Molinari*, 333 F.3d 339 (2d Cir. 2003) (per curiam), involved a letter sent from the borough president to a billboard owner. *Id.* at 340-42. The letter directed the billboard owner to contact the borough president's legal counsel, and it referenced the "substantial economic benefits" the owner receives from other billboards in the borough. *Id*. at 342. The threat was implicit.

In *Backpage.com v. Dart*, 807 F.3d 229 (7th Cir. 2015), a sheriff wrote on official letterhead to various credit card companies requesting that they "immediately cease and desist" ties with a particular website, calling those ties "increasingly indefensible," suggesting the companies could be prosecuted under various laws, and seeking "contact information for an individual within your organization that I can work with [harass, pester] on this issue." *Id.* at 231-32 (bracketed words in reported decision).

While the thinly-veiled threats in each of these three cases sufficed to establish standing, the university's invitation to a voluntary meeting here is readily distinguishable. As the Seventh Circuit explained: "What matters is the distinction between attempts to convince and attempts to coerce." *Backpage.com*, 807 F.3d at 230 (quoting *Okwedy*, 333 F.3d at 344). Here, Speech First has fallen far short of showing that BIRT's actions are attempts to coerce anyone.

26

Speech First also cites *Speech First, Inc. v Schlissel*, 939 F.3d 756 (6th Cir. 2019), where a divided panel found the University of Michigan's Bias Response Team (the "Michigan Team") chilled speech in a manner sufficient to demonstrate Speech First's standing. *Id.* at 765. The majority emphasized two points about the Michigan Team: (1) its ability to make referrals to the Office of Student Conflict Resolution and the police; and (2) its ability to invite students to a voluntary meeting. *Id*. But, that decision does not help Speech First because it conflicts with the Fourth Circuit's holding in *Abbott*.

Besides, even in the absence of *Abbott,* the majority opinion in *Schlissel* is not persuasive, at least as applied to Virginia Tech. First, BIRT's ability to refer information to campus disciplinarians or law enforcement does not establish an objectively reasonable basis for Speech First's members to self-censor protected speech. As Judge White noted in her *Schlissel* dissent, "there is no evidence that a Response Team member has or would refer a 'bias incident' to the OSCR or police without that incident constituting a violation of the Statement or a crime." 939 F.3d at 772 (White, J., dissenting). Judge White's observation is directly applicable here: BIRT makes referrals to the student disciplinary process only if bias-motivated speech is accompanied by behavior that independently violates the Student Code. Because the "controversial" speech that the Students want to express does not violate the Student Code or any law, it *cannot* be the basis for a referral. Speech First does

27

not even suggest that such speech would be a basis for a referral, and it certainly has not submitted evidence that a referral has been made in these circumstances.[12]

BIRT's ability to request voluntary meetings with students does not demonstrate standing either. The majority in *Schlissel* held that "referral power lurks in the background of the invitation," such that a student could understand the invitation to carry a threat of referral. 939 F.3d at 765. Whatever basis the Sixth Circuit might have had for its conclusion, the record demonstrates that the opposite is true here. Again, the *only* basis upon which a referral would be made by BIRT is if a student's conduct violates the Student Code or the law, and there is no evidence university officials have made such a referral for refusal to attend a voluntary meeting. Consequently, the *Schlissel* majority's reasoning is inapplicable here. Further, as previously noted, referrals are not limited to BIRT.

Finally, the Seventh Circuit's decision in *Killeen*, 968 F.3d 628, supports Virginia Tech. In *Killeen*, Speech First presented no evidence that the University of Illinois's Bias Assessment and Response Team (BART) would refer students to

---

[12] Moreover, as Judge White noted, the notion that a referral to the Office of Student Conduct or the campus police might chill a student's speech is misplaced for another reason. There is no requirement that violations of the Student Code or the law be channeled through any central campus agency. "Thus, even if Response Team [or BIRT] members did refer reported conduct to the OSCR or police, any member of the University community was already able to do so." *Schlissel*, 939 F.3d at 772 (White, J., dissenting). In other words, giving BIRT that authority simply makes no difference.

university police for failure to respond to their outreach or accept a meeting. *Id.* at 642-43. Nor did Speech First present evidence that students there interpreted the invitation as an implicit threat. The Court concluded that Speech First's "sparse submission" failed to demonstrate that any of its members faced a credible threat of enforcement based on their speech or that BART's responses to reports of bias-motivated incidents had an objectively chilling effect. *Id.* at 644. The Seventh Circuit compared Speech First's three-page bare-boned declaration from someone lacking first-hand knowledge of BART and how it operates on campus to the University's multiple, detailed affidavits that consistently described BART's operations. *Id.*

The same reasoning applies here in light of Virginia Tech's multiple declarations, which describe BIRT in great detail. JA355-61, JA381, JA385-87. Speech First attempts to distinguish the instant case from *Killeen* based on declarations of the three students, but this misses the point. None of the students indicated that they ever had a bias complaint filed against them, that they ever received any communication from BIRT, or that they engaged with BIRT in any way. *See generally*, JA337-41, JA347-51. As in *Killeen*, Speech First did not provide evidence from anyone who has first-hand knowledge of BIRT or who has *any experience* engaging with BIRT. The outcome should be the same here.

In sum, Speech First did not establish an injury in fact so as to confer standing because BIRT does not proscribe anything at all, Speech First did not establish any credible threat of enforcement, and Speech First did not show that BIRT objectively chilled speech. Consequently, Speech First failed to meet its burden to establish standing and the District Court correctly refused to enter a preliminary injunction.

### 3. Even if Speech First Could Show Standing, No Preliminary Injunction Should Be Issued.

Assuming *arguendo* that Speech First has standing, this Court should still not issue a preliminary injunction. The requirements for such relief are not met. Those requirements were recognized in *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342 (4th Cir. 2009), where this Court said that, in order to obtain a preliminary injunction, "the plaintiff must establish '[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.'" *Id.* at 346 (quoting *Winter*, 555 U.S. at 20). Moreover, "all four requirements must be satisfied." *Id.* However, "[t]he balance of harms and the public interest factors merge when the government is the opposing party." *Trump v. Thompson*, No. 21-5254, 2021 U.S. App. LEXIS 36315, at *43-44 (D.C. Cir. Dec. 9, 2021) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

The first two factors favor Virginia Tech for the reasons already discussed in connection with standing. But, there is more. The sweeping injunction sought by

Speech First, stopping the BIRT dead in its tracks, would go too far under any circumstances. The consequences would be considerable:

- By choking off Virginia Tech's ability to receive complaints of bias, the injunction would deprive the institution of the opportunity to report back to complainants—as it often now does—that the speech at issue is protected by the First Amendment. Valuable teaching moments would be lost, and the educational mission of the University harmed—a mission that "long has been viewed as a special concern of the First Amendment." *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 312 (1978).

- Moreover, by paralyzing Virginia Tech's procedures for dealing with bias, the injunction would cripple the institution's ability to deal with "speech" that the Constitution does *not* protect. Examples include (a) the hanging of nooses, painting of swastikas, or even cross-burning, with intent to intimidate; (b) sexual or racial harassment rising to the level of a hostile environment; and (c) racial and other epithets delivered against or about specific individuals in a manner likely to cause a breach of the peace or injure reputation.

These consequences tilt the equities against the requested injunction and make any such order contrary to the public interest.

**II.  The District Court Correctly Concluded that Virginia Tech Should Not Be Preliminarily Enjoined from Enforcing Its Informational Activities Policy.**

**A.  Virginia Tech Has Wide Latitude to Regulate Campus Access.**

In order to understand the latitude that the First Amendment allows public universities in their campus speech policies, "we must identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic." *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 797 (1985).  The Supreme Court has recognized three types of fora.

> **First, traditional public forum:**  As the Court has explained:
>
> [M]embers of the public retain strong free speech rights when they venture into ***public*** streets and ***parks***, which have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. …  In order to preserve this freedom, government entities are strictly limited in their ability to regulate private speech in such ***traditional public fora***.

*Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009) (cleaned up) (emphasis added).  Of course, even there, "***[r]easonable time, place, and manner restrictions are allowed***, … but any restriction based on the content of the speech must satisfy strict scrutiny, that is, the restriction must be narrowly tailored to serve a compelling government interest, … and restrictions based on viewpoint are prohibited." *Id.* (cleaned up) (emphasis added).

32

**Second, the designated public forum:**

> [A] government entity may create a "designated public forum" if
> government property that has not traditionally been regarded as a public
> forum is intentionally opened up for that purpose. … Government
> restrictions on speech in a designated public forum are subject to the
> same strict scrutiny as restrictions in a traditional public forum.

*Id.* 469-70 (cleaned up) (emphasis added).  And, just as reasonable time, place and

manner restrictions are allowed in a traditional public forum, they are also allowed

in a designated public forum.  *Minn. Voters All. v. Mansky*, 585 U.S. ___, 138 S. Ct.

1876, 1885 (2018).

      **Third, the non-public forum:** "[A] government entity may create a forum

that is ***limited to use by certain groups*** or dedicated solely to the discussion of certain

subjects. …  In such a forum, a government entity may impose restrictions on speech

that are ***reasonable and viewpoint-neutral***."  *Pleasant Grove City*, 555 U.S. at 470

(cleaned up) (emphasis added).  Obviously, reasonable time, place and manner

restrictions are constitutional here as well.

      The term "**limited public forum**" has also been used, though not always

consistently.  "At times, the Supreme Court has referred to limited public forums as

being a subcategory within a designated public forum. …  In more recent cases,

however, the Court has used the phrase 'limited public forum' to describe a type of

nonpublic forum of limited open access."  *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d

330, 345 n. 10 (5th Cir. 2001).  The Fourth Circuit's use of the term can be found in

*Child Evangelism Fellowship of Md., Inc. v. Montgomery County Pub. Sch.*, 457 F.3d 376 (4th Cir. 2006), which explained that "[i]n a limited public forum, the government creates a channel for a specific or limited type of expression where one did not previously exist." *Id.* at 382. "In such a forum, 'the State may be justified in reserving [its forum] for certain groups or for the discussion of certain topics,' subject only to the limitation that its actions must be viewpoint neutral and reasonable." *Id.* (citing *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106-07 (2001)).

Turning to Virginia Tech, the campus is *not* a traditional public forum. The Supreme Court has "recognized that the campus of a public university, at least for its students, possesses ***many of the characteristics*** of a public forum." *Widmar v. Vincent*, 454 U.S. 263, 267 n. 5 (1981) (emphasis added). But, the Court has never said that a public university's campus ***is*** a public forum, much less that it is a traditional or designated public forum. On the contrary, as the Court further explained:

> A university ***differs in significant respects from public forums*** such as streets or parks or even municipal theaters. A university's mission is education, and decisions of this Court have never denied a university's authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities.

*Id.* (emphasis added). "Streets and parks" are classic examples of traditional public fora. *Pleasant Grove*, 555 U.S. at 469. By expressly recognizing that a university

34

campus differs significantly from them, the Court implicitly signaled that such a campus is *not* a traditional public forum. Speech First's brief makes no claim to the contrary. *See also ACLU v. Mote*, 423 F.3d 438, 444 (4th Cir. 2005) (rejecting claim that the University of Maryland's campus should be treated as a traditional public forum and open to all).

Similarly, a "municipal theater" is typically a designated public forum. *See, e.g., Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 555 (1975). By expressly recognizing that a university campus differs significantly from a municipal theater, the Court clearly signaled that the campus is *not* a designated public forum either. A university could, by deliberate action, undoubtedly dedicate all or part of its campus for use as a public forum. But Virginia Tech has never done so. Neither Speech First's brief nor its Complaint makes any claim to the contrary.

This leaves the third type of forum. By process of elimination, Virginia Tech's campus is ***most like*** a ***non-public*** forum. *See Gilles v. Torgersen*, Civil No. 92-0933-R, 1995 U.S. Dist. LEXIS 8502, at *16 (W.D. Va. Jan. 31, 1995) (holding that "the Virginia Tech campus … is not a public forum"), vacated due to lack of standing, 71 F.3d 497 (4th Cir. 1995). In *Mote, supra,* the Court treated the University of Maryland campus as a limited public forum, but only because of its policy allowing generous access by members of the general public. *See* 423 F.3d at 444 ("There is nothing in the record to indicate that until the policy at issue here was

35

implemented, the campus was anything but a non-public forum for members of the public not associated with the university."). In the instant case, there is nothing in the record indicating that Virginia Tech has emulated the University of Maryland's policies. Virginia Tech remains a non-public forum. Indeed, the campus is not open to the public and is "limited to use by certain groups." *Pleasant Grove,* 555 U.S at 470. Thus, Virginia Tech "may impose restrictions on speech that are reasonable and viewpoint-neutral." *Id.* Reasonable time, place and manner restrictions are, of course, permissible in such a forum, just as they are in traditional and designated fora.

In addition to the basic forum analysis, special latitude is afforded a public institution of higher education which has "authority to impose reasonable regulations compatible with that [educational] mission upon the use of its campus and facilities." *Widmar*, 454 U.S. at 267 n. 5. Moreover, as the Supreme Court noted in another case involving a public university, "[a] State's restriction on access … need ***not*** be the ***most*** reasonable or the ***only*** reasonable limitation." *Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*, 561 U.S. 661, 692 (2010) (cleaned up) (emphasis added). Indeed, "the ***advisability*** of [the university's] policy does not control its ***permissibility.***" *Id.* (emphasis in original).

**B.**      **This Court Should Reject Speech First's Effort to Paint the Informational Activities Policy as an Invalid Prior Restraint.**

Speech First misconstrues the informational activities policy in an attempt to recast it as a draconian measure, rather than a reasonable restriction on access for distributing literature or collecting signatures.[13]   It first contends that the informational activities policy is invalid on the theory that it is a "prior restraint." Speech First is mistaken.   To begin, the term "prior restraint" hardly seems applicable where would-be speakers have no pre-existing right to occupy the property for their own purposes.   Besides, so-called "prior restraint" rules are not *per se* invalid.   In *Greer v. Spock*, 424 U.S. 828 (1976), a case upholding restrictions on distribution of literature, even the dissent recognized that prior restrains are not necessarily invalid: "The imposition of prior restraints on speech or the distribution

---

[13]      Policy 5215 (JA223-36) entitled "sales, solicitation, and advertising" deals mainly with commercial sales and fundraising on campus.  One comparatively small section of a much larger policy, Section 2.1.3, states:

> Informational activity is defined as the distribution of literature and/or petitioning for signatures where no fee is involved nor donations or contributions sought.
>
> Informational activities may be permitted if they are sponsored by a university-affiliated organization.  Such activities require prior approval by the designated university scheduling office and are subject to university policies and the reasonable guidelines of the authorizing official.

This is the only campus access policy challenged by Speech First, and it puts no restrictions on any other kind of expressive activity.

of literature in **_public areas_** has been consistently rejected, **_except_** to the extent such restraints sought to control **_time, place, and circumstance_** rather than **_content_.**"  424 U.S. at 866 (Brennan and Marshall, JJ., dissenting) (citing *Police Dept. of Chicago v. Mosley*, 408 U.S. 92 (1972); *Hague v. CIO*, 307 U.S. 496 (1939); *Lovell v. City of Griffin*, 303 U.S. 444 (1938)) (emphasis added).  As this Court has recognized, "even a prior restraint can survive constitutional challenge, provided that it is a content-neutral time, place, and manner regulation that satisfies certain constitutional requirements." *Green v. City of Raleigh*, 523 F.3d 293, 300 (4th Cir. 2008).

Applying these concepts here, Virginia Tech's campus is not a "public area" in the ordinary sense of the term.  Moreover, the informational activities policy seeks to control "time, place, and manner"—not content.  This is shown by the undisputed testimony of Heather Wagoner, the Virginia Tech official charged with supervising the process.  As she explained, while the leafletting locations must be reserved in advance, such reservations are:

> free of charge and are provided **_without regard to the content_** of the proposed informational activity on a **_first come, first served_** basis. …
> Importantly, the "approval" required from SECL to conduct informational activities is **_merely to make a reservation_**—there is no application process, and SECL **_does not exercise any discretion_** in deciding which RSOs will be permitted to use University spaces.

JA420 (emphasis added).

The District Court found this evidence persuasive: "[T]he 'approval' required under Policy 5215 for students to engage in informational activities requires ***nothing more than a reservation***." JA685-86 (emphasis added).[14]  This factual finding by the District Court can only be overcome if Speech First can point to evidence making the finding clearly wrong.  *Leaders of a Beautiful Struggle*, 2 F.4th at 339 (stating that factual findings are reviewed for clear error) (emphasis added).  Speech First insinuates that only groups whose views the University finds palatable will be given access to the campus to hand out leaflets or collect signatures on a petition.  *See* App. Br. at 9-10.  But it points to no *evidence* of any such content or viewpoint discrimination at Virginia Tech.  Nor does its Complaint even *allege* any such discrimination in giving access to campus.  Indeed, there is none.

Instead of dealing with how the Virginia Tech policy is actually implemented, Speech First speculates about how the policy might be implemented in some hypothetical universe.  Its arguments are flawed on a number of levels.  First, if a defendant's actual practice is not objectionable and no adverse change in the practice is imminent, there is no on-going harm or threatened harm and, hence, no justification for a preliminary injunction.  *Faulkner v. Jones*, 10 F.3d 226, 235 (4th

---

[14]     Speech First complains that there are no "time limits on when the University must grant or deny a student's application."  App. Br. at 32.  But the complaint is misplaced.  "[T]here is no application process."  JA420.  This is a *reservation* system, and there is no evidence of any eligible group being treated otherwise.

Cir. 1993) ("A failure to establish irreparable harm is by itself a sufficient ground upon which to deny a preliminary injunction.") (internal quotations omitted). At the very least, it is not an abuse of discretion for the district court to decline to grant such extraordinary relief.

Second, even if the Court were to limit itself to the written words of the Virginia Tech policy—and disregard actual practice—Speech First still offers flawed arguments. Indeed, Speech First's chief objection to the informational activities policy is based on misreading its terms and taking its language out of context. According to Speech First: "The policy states only that ***the request*** will be '***subject to university policies*** and the reasonable guidelines of the authorizing official.'" App. Br. at 32 (purporting to describe JA225) (emphasis added). But, that is ***not*** what the policy actually says. Instead, it says: "Such [informational] ***activities*** require prior approval by the designated university ***scheduling*** office and ***are subject to university policies*** and the reasonable guidelines of the authorizing official." JA225 (emphasis added).

To examine this sentence, the reference to approval coming from a "scheduling" office illustrates that this is a ***reservation*** system, not ***censorship***. Moreover, it is not the ***request*** that is subject to other university policies (the word "request" does not appear in the sentence); it is the "***activities***" themselves that are subject to those policies. In other words, *after* a student group's request has been

40

granted and they are on campus passing out materials, they are still subject to other policies that may govern their conduct. *See, e.g.,* JA228 (prohibiting placing leaflets on car windshields and requiring that distribution of literature "be accomplished in such a manner as to avoid litter or disruption").[15] Speech First does not appear to take issue with those policies and, in any event, such post-approval requirements are certainly not a "prior restraint."

Third, the most important university policy that might affect those leafletting activities is the right of free speech, which the Student Code of Conduct ***specifically guarantees:*** "Students at Virginia Tech enjoy those rights guaranteed by the Constitutions of the United States and the Commonwealth of Virginia. This includes activities protected under the First Amendment." JA100. Moreover, as the Student Code of Conduct reminds students: "In accordance with the Code of Virginia, incidents of disruption of constitutionally protected speech may be reported via the Speech on Campus webpage." *Id.* Thus, a student group that has a reservation to pass out leaflets may not interfere with the free speech rights of others who may disagree, nor may others interfere with the rights of those passing out the leaflets.

---

[15]     Similarly, depending on circumstances, there may be some need to give the student group some additional guidelines for its conduct on campus as it passes out its leaflets, which is why the policy includes a reference to "the reasonable guidelines of the authorizing official." JA225.

And, anyone who feels his or her rights have been violated has an easy avenue to complain to Virginia Tech officials.

Finally, this Court has already ruled that a public university may impose reasonable time, place and manner restrictions on the use of its campus for First Amendment activities. *See, e.g., Glover v. Cole*, 762 F.2d 1197, 1202 (4th Cir. 1985). The policy of limiting leafletting to certain areas and requiring advance reservations is reasonable. *See supra* at 11; *see also* JA689 (District Court Opinion).

## C. The Preference for Recognized Student Organizations Is Constitutional.

Taking another tack, Speech First contends that the informational activities policy is an unconstitutional speaker-based regulation. *See* App. Br. at 35. But, that theory is also wrong. It is true that RSOs and individual students who are "sponsored" by an RSO (or other "university-affiliated organization") can obtain access to "tabling" locations, while those students without sponsorships must rely on other avenues of communication. But, Speech First's arguments are flawed for several reasons.

To begin, Speech First has no standing to challenge the sponsorship requirement. In *Gilles v. Torgersen*, 71 F.3d 497 (4th Cir. 1995), this Court said that an itinerant preacher "lacks standing to [challenge a sponsorship requirement] because he has not been prevented from preaching at Virginia Tech on account of his ***inability to secure sponsorship***…." *Id.* at 499 (emphasis added). The preacher

42

had a sponsor (Virginia Tech), while these Students apparently do not. But, neither have they shown an "inability to secure sponsorship" or that it would be too burdensome to make the effort. Thus, the Students—and Speech First—lack standing to challenge the sponsorship rule.

Moreover, the distinction Speech First challenged is perfectly constitutional in a university setting. Speech First contends that the issue must be examined under strict scrutiny. *See* App. Br. at 36. But, none of the cases it cites govern the speaker-based distinctions that a public university might make in allowing access to its campus.

- Speech First cites *Citizens United v. Fed. Election Comm's*, 558 U.S. 310 (2010), but that case did not involve a college campus or any other non-public forum, nor did it involve a time, place, and manner restriction. Instead, the "purpose and effect" of the challenged statute "[were] to silence entities whose voices the Government deems to be suspect." *Id.* at 339. Thus, the Court used strict scrutiny to determine that corporations could not be categorically prohibited from spending money on communications to influence the outcome of an election. There is no categorical ban on any student's speech at Virginia Tech.

- Speech First cites *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155 (2015), claiming that the informational activities policy "may be justified only if

the [University] proves that [the policy is] narrowly tailored to serve compelling state interests." *Id.* at 163. But, as suggested by Speech First's use of brackets around "University," that was not a *campus* speech case, either. Instead, it dealt with a *town's* attempt to regulate the size of signs that homeowners could place on their property, with permissible sizes varying based on content. *Id.* at 159. For example, "ideological" signs were allowed to be larger than "political" signs. *Id.* at 159-60. So, of course, strict scrutiny was used there. But, the policies at issue here are not content-based and only implicate university property.

Instead of looking for the applicable standard of review in the cases cited by Speech First, the Court should rely on *Martinez*, 561 U.S. at 692. Decided shortly after *Citizens United, Martinez* involved the Hastings College of Law, which distinguished between two speaker categories: (1) student groups officially recognized by the university ("RSOs") and (2) those not so recognized. Much of *Martinez* is directly applicable here.[16]

As *Martinez* explains, "the Court has permitted restrictions on access to a limited public forum, **like the RSO program here**, with this key caveat: Any access

---

[16] One major difference with *Martinez* is that, at Hastings, religious, political and other groups could not obtain recognition unless they forfeited their right to limit their membership and leadership positions to students who agreed with their beliefs. 561 U.S. at 671 and n. 2. Virginia Tech has no such policy. The ease of obtaining recognition at Virginia Tech makes its reservation policy all the more reasonable.

barrier must be ***reasonable*** and viewpoint neutral." 561 U.S. at 679 (emphasis added).  "[W]e … consider whether [the university's] policy is ***reasonable*** taking into account the RSO forum's function and all the surrounding circumstances."  *Id.* at 685 (cleaned up) (emphasis added).  So, strict scrutiny has no role here.

Virginia Tech has already shown that its informational activities policy is viewpoint neutral (*see supra* at 16, 38-39).  It is also reasonable.  As *Martinez* also explained:  "Our inquiry is shaped by the educational context in which it arises: First Amendment rights . . . must be analyzed in light of the ***special characteristics of the school environment.***"  561 U.S. at 685-86 (cleaned up) (emphasis added).  The Supreme Court is, of course, the "final arbiter of . . . whether a public university has exceeded constitutional constraints."  *Id.* at 686.  But, as the Supreme Court has also emphasized, it is "[c]ognizant that judges lack the on-the-ground expertise and experience of school administrators," and it has "cautioned courts in various contexts to resist substitut[ing] their own notions of sound educational policy for those of the school authorities which they review."  *Id.*  Moreover,

> A college's commission--and its concomitant license to choose among pedagogical approaches--is not confined to the classroom, for extracurricular programs are, today, essential parts of the educational process. . . . Schools, we have emphasized, enjoy a significant measure of authority over the type of officially recognized activities in which their students participate.

*Id.* at 686-87.

With reasonableness as the touchstone—and with university officials being entitled to substantial deference—several key points undergird the constitutionality of Virginia Tech's preference for RSOs and other university-affiliated organizations.

First, Virginia Tech has between 750 and 850 RSOs. JA402. Given the potential demands for limited space, it is reasonable to prefer those students who, by forming an organization, have shown some likelihood of structure and continuity in their contribution to the marketplace of ideas.

Second, while favoring structure and continuity, the University makes it easy to become an RSO. "There are only two requirements for students to form a new RSO: 5 individuals who will join the organization, and a unique purpose that the organization will serve—that is, a proposed new RSO cannot serve exactly the same purpose as an existing RSO." JA401. And, of course, there is no content-based test for becoming an RSO. JA423 (outline of process); JA401 ("SECL staff make no content-based decision with regard to recognizing new RSOs."). The record is bereft of any evidence that Speech First attempted to register as a student organization, even though it could easily do so.[17]

Registering as an RSO would remedy any "harm" that Speech First might claim to suffer as the result of the alleged "speaker-based" discrimination. Thus, the

---

[17]      Three Speech First members have filed affidavits in this lawsuit and, according to its own pleadings, the organization has ***more*** than that number.

alleged harm is not "irreparable" and, for this reason, too, a preliminary injunction should not be issued.

Third, the role of Virginia Tech RSOs is not simply to advance their own organization's speech. They may also *sponsor* non-members. Thus, one need not be a member of an RSO to leaflet or petition on campus. *See supra* at 14 (quoting policy). Given the many RSOs at Virginia Tech, including conservative groups (JA405-07), it is likely that these conservative Students could readily find an RSO to sponsor their leafletting or petition activities. But, there is no evidence they ever tried.

Finding such a sponsor would be another way to remedy the "harm" that Speech First's members now claim. Without any evidence that such a sponsor would not be reasonably available, there is, again, no showing of irreparable harm.

Fourth, limiting "tabling" access to RSOs prevents them from "gaming the system" and excluding other groups. If individual students could sign up for table space without any sponsoring group, then a 30-member RSO could unfairly dominate the forum by sending its members to reserve 30 tables individually. Instead of the College Republicans and Young Democrats each having its own table outside a major event, all the tables could be taken by whichever RSO first sent its members to the reservation office, thereby excluding or minimizing their opposition and other groups wishing to be heard.

Fifth, there are ample avenues for Speech First and its members to communicate without either forming their own RSO or obtaining the sponsorship of one. As explained in *Martinez*, "when access barriers are viewpoint neutral, our decisions have counted it significant that other available avenues for the group to exercise its First Amendment rights lessen the burden created by those barriers." 561 U.S. at 690. In *Martinez*, for example, the non-RSO group had:

1. "access to school facilities to conduct meetings,"

2. "use of chalkboards and generally available bulletin boards to advertise events," and

3. "electronic media and social-net-working sites."

561 U.S. at 690-91. As the Court recognized, "[m]ost universities and colleges, and most college-aged students, communicate through email, websites, and hosts like MySpace . . . . If [the non-RSO group] had its own website, any student at the school with access to Google--that is, all of them--could easily have found it." *Id.* (rejecting challenge by non-RSO).

The same considerations should apply to these Students, who also have access to other avenues of communication, ranging from the wide array of electronic media to old-fashioned bulletin boards. *See, e.g.,* JA229 ("General Purpose Bulletin Boards" are located "throughout the campus" and are available "for use by ***students***

*and student organizations* to advertise [their] activities and events.") (emphasis added).

Speech First asks the Court to find Virginia Tech's speaker-preference policy unreasonable, based on *Turning Point USA at Arkansas State Univ. v. Rhodes*, 973 F.3d 868 (8th Cir. 2020). There, a state university had an unwritten policy that allowed registered student organizations to conduct tabling activities on the patio outside the student union building, but not other student groups. *Id.* at 873-74. The only justification advanced for the distinction was that the university wanted the patio to remain "a comfortable area." *Id.* at 877. The Eighth Circuit failed to see how the speaker distinction at issue bore any relationship to the asserted interest and, thus, ruled that the distinction was unreasonable. But, that outcome has no relevance here, where Virginia Tech bases it policy on entirely different grounds. What is relevant, however, is this Eighth Circuit comment:

> Public schools are free to restrict forum access when they have a nondiscriminatory reason for doing so. … ***There may be good reasons*** for distinguishing between registered student organizations and other members of the university community for purposes of accessing a particular university forum. But such reasons have not been presented ***in this case.***

973 F.3d at 879 (emphasis added). Unlike the university in *Turning* Point, Virginia Tech has good reasons for its policy, and the policy should be upheld.

**D.     Speech First Has Attempted to Create a Novel Standard of Law to Apply to the Informational Activities Policy.**

**1.  Speech First Selectively Cites Inapposite Cases.**

Speech First disregards the actual law and, instead, uses precedent from cities, public elementary schools and other distinguishable circumstances to create an inapposite pastiche of case law without regard for the difference between a traditional public forum and special considerations that govern speech regulations at a college campus.  In addition, Speech First ignores the obvious distinction between a decision made on a full record at summary judgment and a decision made at the preliminary injunction stage without development of a full record.  For example:

- *Child Evangelism Fellowship of MD, Inc. v. Montgomery Cty. Pub. Sch.*, 457 F.3d 376 (4th Cir. 2006):  Though Speech First claims that this is "right on point," this case involved a school district's restriction on a religious take-home flyer where officials were given "unfettered discretion to deny access to the take-home flyer forum for any reason at all -- including viewpoint discrimination." *Id.* at 386.  As explained, *supra* at 38-39, the informational activities policy does not vest Virginia Tech officials with such discretion, and the policy "requires nothing more than a reservation." JA685-86.

- *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975):  A municipality unlawfully prevented a promotor from using a ***municipal***

50

***auditorium*** to produce *Hair* without any policy and ***based on content***.  *Id.* at 552, 554-55.  This is distinguishable because: (a) "a university differs in significant respects from . . . municipal theaters," *Widmar*, 454 U.S. at 267 n. 5; and (b) Virginia Tech's policy is content neutral.  *See supra* at 39.

- *Weinberg v. City of Chicago*, 310 F.3d 1029 (7th Cir. 2002):  On a ***full record***, the plaintiff was ***granted summary judgment*** on the impact of a peddling ordinance banning a ***sidewalk sale*** of a tell-all book regarding then owner of the Blackhawks.  *Id.* at 1033.  But, again, "a university differs in significant respects from public forums such as streets," *Widmar*, 454 U.S. at 267 n.5, or their sidewalks.  A regulation that is unreasonable in a traditional public forum may well be reasonable on a college campus. And, to decide for the plaintiff on a full record does not mean that he should have been given an injunction at the outset.  The standards are different.

- *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990):  Following a ***fully developed record and on summary judgment***, the court invalidated a Dallas licensing scheme that required additional inspections for sexually-oriented businesses.  *Id.* at 221.  Such content-based requirements bear no resemblance to Virginia Tech's content-neutral time, place and manner policy.  And again, to decide for the plaintiff on a full record does not mean that he should have been given an injunction at the outset.

- *Shuttlesworth v. City of Birmingham*, 394 U.S. 147 (1969):  The criminal conviction of Rev. Fred Shuttlesworth for failing to obtain a permit for a civil rights march was overturned because the ordinance allowed the city to refuse a permit if "in its judgment the public welfare, peace, safety, health, decency, good order, morals or convenience require that it be refused."  *Id.* at 149-50.  There is no such language in Virginia Tech's policy and no evidence Virginia Tech ever used its policy in a content-based manner.  The Virginia Tech policy is in no way analogous to Birmingham's race-inspired restrictions.

- *American Entertainers, L.L.C. v. City of Rocky Mount*, 888 F.3d 707 (4th Cir. 2018):  Following a ***fully-developed record and the district court's ruling on the parties' summary judgment motions***, the Fourth Circuit ruled that an ordinance was an unconstitutional prior restraint, where it allowed the police chief to deny a license for a sexually-oriented business, if he determined that the business would not comply with all applicable laws.  *Id.* at 713, 720-21.  There is no such language in Virginia Tech's policy and no evidence Virginia Tech ever used its policy in such a manner.  And, again, to decide for the plaintiff on a full record does not mean that he should have been given an injunction at the outset.

## 2.   Speech First Improperly Attempts to Shift The Burden of Proof.

Speech First contends that Virginia Tech has the burden of proof at the preliminary injunction stage to show that its informational activities policy qualifies as a reasonable time, place and manner restriction, but the argument is misplaced for several reasons.

First, as already shown, the policy *is* a reasonable time, place and manner restriction, especially given the deference owed to university educators about the uses of university facilities.  *See supra* at 45.  Accordingly, the placement of the burden at this stage of the case is not relevant.  Virginia Tech prevails either way.

Second, Speech First faults the District Court for refusing to issue a preliminary injunction while leaving the door open for additional evidence.  *See* JA689-90.  Such an approach is within the District Court's discretion.  There was no requirement that it rule one way or the other, as a matter of law, at the preliminary stage of the case.  Instead of complaining, Speech First should be happy to have another bite at the apple.  It will have the chance to show, if it can, that the policy does not actually operate the way that Virginia Tech has described, or that other facts not now in evidence make the policy unreasonable.  But, without any such facts, "Speech First has failed to clearly show that it is likely to succeed on the merits." JA689 (District Court Opinion).

Third, most of the cases Speech First cites in support of its burden of proof argument were decided at the ***summary judgment*** stage. *See Horina v. City of Granite City*, 538 F.3d 624 (7th Cir. 2008) (decision against government on summary judgment); *New York Youth Club v. Town of Harrison*, 150 F. Supp. 3d 264 (S.D.N.Y. 2015) (same); *Edwards v. City of Coeur d'Alene*, 262 F.3d 856 (9th Cir. 2001) (same). These cases have no application to the preliminary injunction stage, where the ***plaintiff*** must show likelihood of success on the merits, including the likelihood that the policy will prove to be unreasonable.

Fourth, Speech First cites *Newsom v. Albemarle Cty. Sch. Bd.*, 354 F.3d 249 (4th Cir. 2003), which dealt with a preliminary injunction, but which gives Speech First no support. In holding that the district court abused its discretion by refusing to grant a preliminary injunction, this Court said: "there was ***no evidence*** presented at the preliminary injunction stage of the case demonstrating that clothing worn by students at [the public school] containing messages related to weapons … ever substantially disrupted school operations or interfered with the rights of others." 354 F.3d at 259 (emphasis added). Accordingly, there was no basis to conclude that the regulation in *Newsom* was reasonable. In sharp contrast with *Newsom*, the record here is replete with evidence supporting the reasonableness of the Virginia Tech policies.

### E.    The Balance of Equities and Public Interest Disfavors the Injunction Sought by Speech First.

Speech First seeks far more than a way to accommodate the desire of its student members to distribute leaflets at Virginia Tech. If that were its aim, there are already ample ways to achieve it, including registering as an RSO or seeking sponsors from existing RSO's, or other university-affiliated organizations. *See supra* at 10-11, 14. What Speech First seeks is a total ban on enforcement of Virginia Tech's informational activities policy. *See* App. Br. at 39. This would, in effect, turn the entire campus into a free-for-all. Anyone (student or non-student) would be able to use any space at any time, without any order and without any regard for the rights of others or the educational mission of the university—again, a mission that "long has been viewed as a special concern of the First Amendment." *Bakke*, 438 U.S. at 312. The Constitution does not require such a chaotic state of affairs in any type of forum, and Speech First cites no authority suggesting that it does. Such an injunction would not be in the public interest, and the equities of the case weigh heavily against it. For this reason, too, the requested injunction should be denied.

### CONCLUSION

The District Court's decision should be affirmed. If, however, this Court finds any error in that decision, no injunction should be issued here. Instead, the case should be remanded for further proceedings.

Dated:  March 11, 2022                Respectfully submitted,


                                      /s/ Jessica A. Glajch
                                      Matthew B. Kirsner
                                      William H. Hurd
                                      ECKERT SEAMANS CHERIN
                                      & MELLOTT, LLC
                                      Suite 1300
                                      919 East Main Street
                                      Richmond, VA 23219
                                      Tel: (804) 788-7744/9638
                                      Fax: (804) 698-2950
                                      Email: mkirsner@eckertseamans.com
                                              whurd@eckertseamans.com


                                      Michael McAuliffe Miller
                                      Renee Mattei Myers
                                      ECKERT SEAMANS CHERIN
                                      & MELLOTT, LLC
                                      8th Floor
                                      1 South Market Square Building
                                      213 Market Street
                                      Harrisburg, PA 17101-0000
                                      Tel:    (717) 237-7174/7163
                                      Fax:    (717) 237-6019
                                      Email: mmiller@eckertseamans.com
                                              rmyers@eckertseamans.com


                                      Jessica A. Glajch
                                      ECKERT SEAMANS CHERIN
                                      & MELLOTT, LLC
                                      1717 Pennsylvania Avenue, NW Suite 1200
                                      Washington, D.C. 20006
                                      Tel:   (202) 659-6672
                                      Fax:   (202) 659-6699
                                      E-mail:  jglajch@eckertseamans.com

## <u>CERTIFICATE OF COMPLIANCE</u>

This Brief complies with the word limit of Fed. R. App. P. 32(a)(7)(B)(i) because it contains 12,975 words, excluding the parts that can be excluded, according to Microsoft Word 2016.   This Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), as it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

Dated: March 11, 2022.                          */s/ Jessica A. Glajch*